IN THE SUPREME COURT OF NORTH CAROLINA

No. 52PA17-2

Filed 26 January 2018

ROY A. COOPER, III, in his official capacity as Governor of The State of North Carolina

v.

PHILIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; TIMOTHY K. MOORE, in his official capacity as Speaker of the North Carolina House of Representatives; and THE STATE OF NORTH CAROLINA

On discretionary review pursuant to N.C.G.S. § 7A-31, prior to a determination by the Court of Appeals, of orders entered on 28 April 2017 and 1 June 2017 in the Superior Court, Wake County, by a three-judge panel appointed by the Chief Justice pursuant to N.C.G.S. § 1-267.1. Heard in the Supreme Court on 28 August 2017. Following oral argument, on 1 September 2017, the Court ordered that this case be remanded to the panel for the entry of a supplemental order. After the entry of the supplemental order, the Court, on 2 November 2017, ordered supplemental briefing. Determined without further oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Daniel F.E. Smith, Jim W. Phillips, Jr., and Eric M. David, for plaintiff-appellant/appellee.*

*Nelson Mullins Riley & Scarborough LLP, by D. Martin Warf and Noah H. Huffstetler, III, for legislator defendant-appellants/appellees.*

*Joshua H. Stein, Attorney General, by Alexander McC. Peters, Senior Deputy Attorney General, for defendant-appellee State of North Carolina.*

*Poyner Spruill LLP, by Andrew H. Erteschik, for Brennan Center for Justice at N.Y.U. School of Law and Democracy North Carolina, amici curiae.*

*Robinson, Bradshaw & Hinson, P.A., by John R. Wester, J. Dickson Phillips, III, Adam K. Doerr, and Kevin Crandall, for James B. Hunt, Jr., and Burley B. Mitchell, Jr., amici curiae.*

ERVIN, Justice.

On 8 November 2016, plaintiff Roy A. Cooper, III, was elected Governor of the State of North Carolina for a four-year term office commencing on 1 January 2017. On 16 December, 2016, the General Assembly enacted Senate Bill 4 and House Bill 17, which abolished the existing State Board of Elections and the existing State Ethics Commission; created a new Bipartisan State Board of Elections and Ethics Enforcement; and appointed the existing members of the State Ethics Commission to serve as the members of the Bipartisan State Board. The legislation in question was signed into law by former Governor Patrick L. McCrory on 16 December 2016. On 17 March 2017, a three-judge panel of the Superior Court, Wake County, convened pursuant to N.C.G.S. § 1-267.1(b1), determined that the legislation in question violated the separation-of-powers provisions of the North Carolina Constitution by unconstitutionally impinging upon the Governor's ability to faithfully execute the laws. *Cooper v. Berger*, No. 16 CVS 15636, 2017 WL 1433245 (N.C. Super. Ct. Wake County, Mar. 17, 2017).

On 25 April 2017, Chapter 6 of the 2017 North Carolina Session Laws became law notwithstanding the Governor's veto. *See* Act of Apr. 11, 2017, ch. 6, 2017-2 N.C. Adv. Legis. Serv. 21 (LexisNexis).[1] Session Law 2017-6 was captioned

> AN ACT TO REPEAL G.S. 126-5(D)(2C), AS ENACTED BY S.L. 2016-126; TO REPEAL PART I OF S.L. 2016-125; AND TO CONSOLIDATE THE FUNCTIONS OF ELECTIONS, CAMPAIGN FINANCE, LOBBYING, AND ETHICS UNDER ONE QUASI-JUDICIAL AND REGULATORY AGENCY BY CREATING THE NORTH CAROLINA BIPARTISAN STATE BOARD OF ELECTIONS AND ETHICS ENFORCEMENT.

The newly-enacted legislation provided, in pertinent part, that:

Article 1.
Bipartisan State Board of Elections and Ethics
Enforcement.

**§163A-1.  Bipartisan State Board of Elections and Ethics Enforcement established.**

There is established the Bipartisan State Board of Elections and Ethics Enforcement, referred to as the State Board in this Chapter.

**§ 163A-2.  Membership.**

(a)  The State Board shall consist of eight individuals registered to vote in North Carolina, appointed by the Governor, four of whom shall be of the political party with the highest number of registered affiliates and four of whom shall be of the political party with the second highest number of registered affiliates, as reflected by the latest

---

[1] Session Law 2017-6 required the Revisor of Statutes to recodify substantial portions of the existing statutory provisions governing elections, campaign finance, lobbying, and ethics into a new Chapter 163A.  Although the necessary recodification has now been completed, the Court will cite to the statutory provisions not directly enacted by virtue of Session Law 2017-6 as they existed prior to the recodification in this opinion.

registration statistics published by the State Board.  The Governor shall appoint four members each from a list of six nominees submitted by the State party chair of the two political parties with the highest number of registered affiliates, as reflected by the latest registration statistics published by the State Board.

. . . .

(c)      Members shall be removed by the Governor from the State Board only for misfeasance, malfeasance, or nonfeasance.   Violation of G.S. § 163A-3(d) shall be considered nonfeasance.

. . . .

(f)      At the first meeting in May, the State Board shall organize by electing one of its members chair and one of its members vice-chair, each to serve a two-year term as such.  In 2017 and every four years thereafter, the chair shall be a member of the political party with the highest number of registered affiliates, . . . and the vice-chair a member of the political party with the second highest number of registered affiliates.  In 2019 and every year four years thereafter, the chair shall be a member of the political party with the second highest number of registered affiliates, as reflected by the latest registration statistics published by the State Board, and the vice-chair a member of the political party with the highest number of registered affiliates.

. . . .

## § 163A-3.  Meetings; quorum; majority.

. . . .

(c)      Unless otherwise specified in this Chapter, an affirmative vote of at least five members of the State Board shall be required for all actions by the State Board.

. . . .

**§ 163A-5. Independent agency, staff, and offices.**

(a) The State Board shall be and remain an independent regulatory and quasi-judicial agency and shall not be placed within any principal administrative department. The State Board shall exercise its statutory powers, duties, functions, and authority and shall have all powers and duties conferred upon the heads of principal departments under G.S. 143B-10.

. . . .

**§ 163A-6. Executive Director of the State Board.**

(a) There is hereby created the position of Executive Director of the State Board, who shall perform all duties imposed by statute and such duties as may be assigned by the State Board.

(b) The State Board shall appoint an Executive Director for a term of two years with compensation to be determined by the Office of State Human Resources. The Executive Director shall serve beginning May 15 after the first meeting held after new appointments to the State Board are made, unless removed for cause, until a successor is appointed. In the event of a vacancy, the vacancy shall be filled for the remainder of the term.

(c) The Executive Director shall be responsible for staffing, administration, and execution of the State Board's decisions and orders and shall perform such other responsibilities as may be assigned by the State Board.

(d) The Executive Director shall be the chief State elections official.

. . . .

**§ 163-30. County boards of elections; appointments; terms of office; qualifications; vacancies; oath of office; instructional meetings.**

In every county of the State there shall be a county board of elections, to consist of four persons of good moral character who are registered voters in the county in which they are to act. Two of the members of the county board of elections shall be of the political party with the highest number of registered affiliates, and two shall be of the political party with the second highest number of registered affiliates, as reflected by the latest registration statistics published by the State Board. In 2017, members of county boards of elections shall be appointed by the State Board . . . . In 2019, members of county boards of elections shall be appointed by the State Board on the last Tuesday in June, and every two years thereafter, and their terms of office shall continue for two years from the specified date of appointment and until their successors are appointed and qualified.

. . . .

The State chair of each political party shall have the right to recommend to the State Board three registered voters in each county for appointment to the board of elections for that county. If such recommendations are received by the Board 15 or more days before the last Tuesday in June 2017 and each two years thereafter, it shall be the duty of the State Board to appoint the county boards from the names thus recommended. . . .

. . . .

At the first meeting in July annually, the county boards shall organize by electing one of its members chair and one of its members vice-chair, each to serve a one-year term as such. In the odd-numbered year, the chair shall be a member of the political party with the highest number of registered affiliates, as reflected by the latest registration statistics published by the State Board, and the vice-chair a member of the political party with the second highest number of registered affiliates. In the even-numbered year, the chair shall be a member of the political party with the second highest number of registered affiliates, as reflected by the latest registration statistics published by

the State Board, and the vice-chair a member of the political party with the highest number of registered affiliates.

. . . .

## § 163-31. Meetings of county boards of elections; quorum; majority; minutes.

. . . Three members shall constitute a quorum for the transaction of board business. Except where required by law to act unanimously, a majority vote for action of the board shall require three of the four members.

. . . .

SECTION 9. Notwithstanding G.S. 163A-2, as enacted by Section 4 of this act, the chairs of the two political parties shall submit a list of names to the Governor . . . , and the Governor shall make appointments from those lists . . . . The State chairs of the two political parties shall not nominate, and the Governor shall not appoint, any individual who has served two or more full consecutive terms on the State Board of Elections or State Ethics Commission, as of April 30, 2017.

SECTION 10. Notwithstanding G.S. 163A-2(f) and (g), as enacted by Section 4 of this act, the Governor shall appoint a member of the State Board to serve as chair, a member to serve as vice-chair, and a member to serve as secretary of the State Board until its first meeting in May 2019, at which time the State Board shall select its chair and vice-chair in accordance with G.S. 163A-2(f) and select a secretary in accordance with G.S. 163A-2(g).

. . . .

Section 17. Notwithstanding G.S. 163A-6, the Bipartisan State Board of Elections and Ethics Enforcement shall not appoint an Executive Director until May 2019. Until such time as the Bipartisan State Board of Elections and Ethics Enforcement appoints an Executive Director in accordance with G.S. 163A-6, as enacted by this

act, the Executive Director of the State Board of Elections under G.S. 163-26, as of December 31, 2016, shall be the Executive Director.

*Id*., secs. 4, 7(h)-(i), 9, 10, 17, at 23-34.

On 26 April 2017, the Governor filed a complaint, a motion for a temporary restraining order, and a motion for a preliminary injunction challenging the constitutional validity of Sections 3 through 22[2] of Session Law 2017-6 and seeking to preclude its implementation. On 27 April 2017, the Chief Justice of the Supreme Court of North Carolina assigned a three-judge panel of the Superior Court, Wake County, to hear and decide this case as required by N.C.G.S. § 1-267.1(b1). On 28 April 2017, defendants Philip E. Berger, in his official capacity as President Pro Tempore of the North Carolina Senate, and Timothy K. Moore, in his official capacity as Speaker of the North Carolina House of Representatives, filed a response in opposition to the Governor's motion for temporary restraining order. On the same date, the panel, by a divided vote, entered an order temporarily enjoining the enforcement of Sections 3 through 22 of Session Law 2017-6 "pending expiration of this Order or further Order of this Court."

---

[2] Sections 1 and 2 of Session Law 2017-6 repealed Part I of Session Law 2016-125 and N.C.G.S. § 126-5(d)(2c) as enacted by Session Law 2016-126. S.L. 2017-6.

On 23 May 2017, the Governor and the legislative leadership filed summary judgment motions.[3] In addition, the legislative leadership filed a motion seeking to have the Governor's complaint dismissed pursuant to N.C.G.S. § 1A-1, Rule 12(b)(1), on the grounds that the claims asserted by the Governor "constitute non-justiciable political questions" and that the Governor "lacks standing" and an answer in which they denied the material allegations of the Governor's complaint and asserted a number of affirmative defenses, including the political question doctrine, and the State of North Carolina filed an answer requesting the panel to "grant such relief as may be just and proper." On 1 June 2017, the panel entered an order dismissing the Governor's complaint pursuant to N.C.G.S. § 1A-1, Rule 12(b)(1). On 6 June 2017, the Governor noted an appeal to the Court of Appeals from the panel's order. On 15 June 2017, the legislative leadership noted an appeal to the Court of Appeals from the temporary restraining order. On 19 July, 20 July, and 24 July 2017, respectively, this Court entered orders granting the Governor's petition for discretionary review prior to a decision by the Court of Appeals, allowing the legislative leadership to file an appellants' brief, prohibiting the parties "from taking further action regarding the unimplemented portions" of the challenged legislation, establishing an expedited briefing schedule, and setting this case for oral argument on 28 August 2017.

---

[3] The parties agreed to an extension of the temporary restraining order pending a decision on the merits as part of a consent scheduling order that the panel entered on 10 May 2017.

In his initial brief, the Governor argued that, while the General Assembly has the authority to enact laws, citing Article II, Sections 1 and 20 of the North Carolina Constitution (vesting "[t]he legislative power" in the General Assembly), its authority is subject to the constraints set out in Article I, Section 6 (providing that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other"). According to the Governor, the panel's decision to dismiss his complaint for lack of subject matter jurisdiction "ignor[es] separation of powers as a cornerstone of State government." In addition, the Governor asserted that he had standing to "protect the constitutional rights granted to his office," citing N.C. Const. art. I, § 6; *id.* art. II, §§ 1, 5; *State ex rel. McCrory v. Berger*, 368 N.C. 633, 645, 781 S.E.2d 248, 256 (2016) (noting that, since the adoption of the 1868 Constitution, the Governor has had the duty, pursuant to Article III, Section 5(4) of the North Carolina Constitution, to faithfully execute the laws); *Mangum v. Raleigh Board of Adjustment*, 362 N.C. 640, 642, 669 S.E.2d 279, 281-82 (2008) (explaining that "the North Carolina Constitution confers standing on those who suffer harm"); *Bacon v. Lee*, 353 N.C. 696, 718, 549 S.E.2d 840, 855 (observing that "Article III, Section 5 of the State Constitution enumerates the express duties of the Governor"), *cert. denied*, 533 U.S. 975, 122 S. Ct. 22, 150 L. Ed. 2d 804 (2001). The Governor denied that this case involves a nonjusticiable political question in light of the judicial branch's duty "to identify where the line should be drawn . . . between the Executive Branch and the Legislature," quoting *News &*

*Observer Publishing Co. v. Easley*, 182 N.C. App. 14, 15-16, 641 S.E.2d 698, 700, *disc. rev. denied*, 361 N.C. 429, 648 S.E.2d 508 (2007). The Governor contended that, contrary to the arguments advanced by the legislative leadership, the presumption of constitutionality does not insulate Session Law 2017-6 from judicial scrutiny, citing *Moore v. Knightdale Board of Elections*, 331 N.C. 1, 4, 413 S.E.2d 541, 543 (1992) (stating that "[t]he presumption of constitutionality is not, however, and should not be, conclusive"). Finally, the Governor contended that the challenged portions of Session Law 2017-6 should be invalidated because they deprive him of the ability to exercise "enough 'control over the views and priorities of the officers' that implement 'executive policy' to allow the Governor to fulfill his constitutional duty of faithful execution," quoting *McCrory*, 368 N.C. at 647, 781 S.E.2d at 257.

The legislative leadership argued, on the other hand, that this case involves a nonjusticiable political question and that the Governor lacks standing to challenge the constitutionality of Session Law 2017-6. According to the legislative leadership, "the commitment of the power to alter the functions and duties of state agencies is reserved for the Legislature," with the manner in which the General Assembly has chosen to exercise that authority constituting a "political question that this Court has no authority to review." In addition, the legislative leadership contended that the Governor lacks standing to challenge the constitutionality of Session Law 2017-6 because the alleged constitutional injury upon which the Governor relies did not result from the enactment of the challenged legislation "given the similar or identical

provisions in prior law," citing N.C.G.S. § 163-19 and section 4(c) of Session Law 2017-6. In view of the fact that the panel did not reach the merits of the Governor's claim, the legislative leadership urged this Court to refrain from addressing the constitutionality of the challenged legislation even if it concluded that this case was justiciable and that the Governor had standing to challenge the constitutionality of Session Law 2017-6. In the event that the Court elected to reach the merits of the Governor's constitutional claim, the legislative leadership asserts that the challenged legislation represents nothing more than the proper exercise of the General Assembly's constitutionally-derived legislative authority.

On 1 September 2017, "without determining that we lack the authority to reach the merits of plaintiff's claims," the Court entered an order concluding that "the proper administration of justice would be best served in the event that we allowed the panel, in the first instance, to address the merits of [the Governor's] claims before undertaking to address them ourselves." As a result, the Court certified this case "to the panel with instructions . . . to enter a new order . . . that (a) explains the basis for its earlier determination that it lacked jurisdiction to reach the merits of the claims advanced in [the Governor's] complaint and (b) addresses the issues that [the Governor] has raised on the merits."

On 31 October 2017, the panel entered an order determining that it lacked jurisdiction to reach the merits of the Governor's claims on the grounds that "[t]he functions, powers, and duties of an agency encompass how a particular agency might

work, its structure, and what role it may play in enforcement of the laws"; "the power to alter the functions and duties of state agencies is reserved to the Legislature through its law-making ability and the Governor through executive order subject to review by the Legislature"; and that "[t]he merger of the Board of Elections and Ethics Commission into the Bipartisan Board . . . is a political question and therefore a nonjusticiable issue." In compliance with our order requesting it to address the merits of the Governor's claims, the panel found that:

> 1. The General Assembly has the authority and power to create and modify the duties of state agencies. *See, e.g., Adams v. N. Carolina Dep't of Nat. & Econ. Res.*, 295 N.C. 683, 696-97, 249 S.E.2d 402, 410 (1978).
>
> . . . .
>
> 5. Plaintiff has produced no authority that a commission or board with an even number of members is unconstitutional as a matter of law. Plaintiff has also produced no authority that "deadlock" on a particular issue constitutes a separation of powers violation.
>
> 6. The requirement that the Governor must make his appointments from lists provided by the state party chairs does not constrain his execution of the laws or otherwise violate separation of powers, as the Governor (and not the General Assembly) has a choice among the names on the lists and is making the decision about who will ultimately serve. . . . Session Law 2017-[6]—N.C. Gen. Stat. § 163-19—also requires that the Governor appoint members to the Board of Elections from lists provided by the party chairs. This requirement was first added by Session Law 1985-62 after the election of Governor James Martin. Other statutory changes to the Board of Elections (including the extension of the term of the Executive Director, see S.L. 1973-1409, § 2; S.L. 1985-62), may have

coincided with a change in the political party of the Governor but have not resulted in constitutional challenges.

. . . .

8. The Executive Director of the Bipartisan Board is to be, beginning in May 2019, chosen by the Bipartisan Board. Until that time, the current Executive Director of the Board of Elections, whose term is extended by Session Law 2017-6, will serve as the Executive Director of the Bipartisan Board. Such a statutory extension of a term of office has been found to be constitutional. . . .

9. The chair of the Bipartisan Board will initially be chosen by the Governor and will, thereafter, be chosen by the Bipartisan Board. . . .

10. The Governor also has the ability to remove any or all members from the Bipartisan Board for misfeasance, malfeasance, or nonfeasance. The General Assembly has no ability to remove members.

11. The Governor has adequate supervision over the Bipartisan Board, given the Bipartisan Board's role in and impact on state government as the oversight authority for ethics, elections, and lobbying. Additionally, Session Law 2017-6 expressly states that the Bipartisan Board must comply with the duties under N.C. Gen. Stat. § 143B-10, which includes reporting duties to the Governor. The General Assembly does not retain the ability to supervise the Bipartisan Board.

12. Session Law 2017-6 reserves no ongoing control to the General Assembly, and therefore, the General Assembly neither exercises power that the constitution vests exclusively in the executive branch nor prevents the Governor from performing his constitutional duties. Were the Governor given the degree of control he seeks over with the Board of Elections or Bipartisan Board in this case, neither Board could continue to function as "an

independent regulatory and quasi-judicial agency" as the Board of Elections under prior law, N.C. Gen. Stat. § 163-28, and the Bipartisan Board would under Session Law 2017-6 (enacting N.C. Gen. Stat. § 163A-5(a)).

13.     On a facial challenge, this Court cannot consider hypothetical situations that *could* sink the statute; to the contrary, Plaintiff must "establish that no set of circumstances exists under which the [a]ct would be valid." *Bryant*, 359 N.C at 564, 614 S.E.2d 486 (2005) (quotations omitted). . . .

14.     There is evidence that supports the Bipartisan Board being able to function in politically divided situations. . . .

15.     There are also numerous other boards and commissions tasked with some administrative functions that are made up of an even number of members such that tie votes and, therefore, deadlock, are hypothetical possibilities. . . .

After conceding that "circumstances could arise where a deadlock or stalemate so stifles the work of the Bipartisan Board that [the Governor] would have standing to raise a challenge that this statute is unconstitutional, not on its face but as applied to that particular situation," the panel held that Session Law 2017-6 is not unconstitutional on its face.

In the supplemental briefs that the Court requested following the filing of the panel's order, the Governor argued that "the judicial branch has subject matter jurisdiction to resolve separation of powers disputes," citing *McCrory*, 368 N.C. at 638, 781 S.E.2d at 25, *In re Alamance County Court Facilities*, 329 N.C. 84, 99, 405 S.E.2d 125, 132 (1991), and *State ex rel. Wallace v. Bone*, 304 N.C. 591, 608, 286

S.E.2d 79, 88 (1982), and that he has standing to advance the claim asserted in this complaint because the "North Carolina Constitution confers standing on the Governor to challenge statutes that cause him constitutional harm," citing Article I, Section 18 of the North Carolina Constitution and *Mangum*, 362 N.C. at 642, 669 S.E.2d at 281-82. In addressing the merits of his challenge to Session Law 2017-6, the Governor contends that the General Assembly's action in appointing the Executive Director of the Bipartisan State Board represented an unconstitutional exercise of control over an executive branch agency, with decisions authorizing legislative extensions of existing terms of office being inapplicable to a proper constitutional analysis given that those cases involved pre-existing municipal offices in which an incumbent's term was extended in lieu of holding a new election, citing *Penny v. Salmon*, 217 N.C. 276, 277, 7 S.E.2d 559, 560 (1940), and *Crump v. Snead*, 134 N.C. App. 353, 354, 517 S.E.2d 384, 385, *disc. rev. denied*, 351 N.C. 101, 541 S.E.2d 143 (1999), while the office of Executive Director of the Bipartisan State Board did not exist prior to the enactment of the challenged legislation, citing section 4(c) of Session Law 2017-6 (creating "the position of Executive Director of the State Board"), and given that the challenged legislation abolished the office of Executive Director of the State Board of Elections, citing subsections 7(e) and (f) of Session Law 2017-6 (repealing N.C.G.S. §§ 163-26). Finally, the Governor contends that Session Law 2017-6 contravenes the separation-of-powers principles set out in *McCrory*, which require a reviewing court to focus upon the extent to which the Governor has a

sufficient degree of control over executive branch agencies. According to the Governor, *McCrory* requires that "the Governor must have 'enough control' over executive branch entities and officials that possess 'final executive authority' in order to perform his constitutional duty to ensure that the laws are faithfully executed," quoting *McCrory*, 368 N.C. at 646, 781 S.E.2d at 256, with the requisite degree of control being exercised by means of appointment, supervision, and removal, citing *McCrory*, 368 N.C. at 646, 781 S.E.2d at 256. Although the General Assembly may require the appointment of statutory officers from lists and may require that appointees satisfy additional qualifications, the provisions of the challenged legislation "deprive[ ] the Governor of the ability to appoint a majority of members of the [Bipartisan] State Board who share his views and priorities."

On the other hand, the legislative leadership argues that the panel correctly decided that it lacked jurisdiction over the subject matter at issue in this case because the North Carolina Constitution provides the Governor with the authority to "make such changes in the allocation of offices and agencies and in the allocation of those functions, powers, and duties as he considers necessary for efficient administration," subject to later legislative review, quoting Article III, Section 5(10) of the North Carolina Constitution, thereby eliminating any need for the judicial branch to "interject itself into a balance struck in the text of the Constitution specifically dealing with the organization and structure of a state agency." For that reason, "[t]he question raised in this case by the Governor goes to the structure and function of the

agency, which is textually committed to a balance struck in the text of the Constitution."

As far as the merits are concerned, the legislative leadership contends that *McCrory* does not necessitate the invalidation of Session Law 2017-6 because the Bipartisan State Board is structured as an independent agency. According to the legislative leadership, "the quasi-judicial nature of a commission can support its independence from being under the thumb of the executive," citing *Morrison v. Olson*, 487 U.S. 654, 687-88, 108 S. Ct. 2597, 2617, 101 L. Ed. 2d 569, 603 (1988). In addition, unlike the situation at issue here, the General Assembly appointed more members to the executive bodies at issue in *McCrory* than the Governor, citing *McCrory*, 368 N.C. at 637-38, 781 S.E.2d at 250-51. Finally, the legislative leadership asserts that the Executive Director of the Bipartisan State Board is, on an ongoing basis, to be appointed by the members of the Bipartisan State Board and that the sole authority to remove the Executive Director is vested in the members of the Bipartisan State Board, citing section 4(c) of Session Law 2017-6. The legislative leadership further argues that the provisions of Session Law 2017-6 designating the Executive Director of the Bipartisan State Board represent nothing more than the extension of a pre-existing term of office and that the Governor has mischaracterized the role of the Executive Director, whose authority is limited to "staffing, administration, and execution of the State Board's decisions and orders," quoting section 4(c) of Session Law 2017-6.

"[O]ne of the fundamental principles on which state government is constructed," John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 50 (2d ed. 2013), is that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other," N.C. Const. art. I, § 6. The legislative power is "vested in the General Assembly," N.C Const. art. II, § 1, which "enact[s] laws, within constitutional limits, to protect or promote the health, morals, order, safety, and general welfare of society," *State v. Ballance*, 229 N.C. 764, 769, 51 S.E.2d 731, 734 (1949) (citations omitted); *see also* N.C. Const. art. II, § 20. "The executive power of the State shall be vested in the Governor," N.C. Const. art. III, § 1, who "faithfully executes, or gives effect to, these laws," *McCrory*, 368 N.C. at 635, 781 S.E.2d at 250; *see also* N.C. Const. art. III, § 5(4).[4] Finally, "[t]he judicial power of the State, shall . . . be vested in a Court for the Trial of Impeachments and in a General Court of Justice," N.C. Const. art. IV, § 1, which "interprets the laws and, through its power of judicial review, determines whether they comply with the constitution," *McCrory*, 368 N.C. at 635, 781 S.E.2d at 250; *see also* N.C. Const. art. IV, § 1. *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 6-7 (1787).

"The political question doctrine controls, essentially, when a question becomes 'not justiciable . . . because of the separation of powers provided by the Constitution.' " *Bacon*, 353 N.C. at 717, 549 S.E.2d at 854 (alteration in original) (quoting *Powell v.*

---

[4] As was the case in *McCrory*, 368 N.C. at 646 n. 5, 781 S.E.2d at 256 n. 5, "[o]ur opinion takes no position on how the separation of powers clause applies to those executive departments that are headed by the independently elected members of the Council of State."

*McCormack*, 395 U.S. 486, 517, 89 S. Ct. 1944, 1961, 23 L. Ed. 2d 491, 514 (1969)).

"The . . . doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the" legislative or executive branches of government. *Id.* at 717, 549 S.E.2d at 854 (alteration in original) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230, 106 S. Ct. 2860, 2866, 92 L. Ed. 2d 166, 178 (1986)). "In determining whether a question falls within [the political question] category, the appropriateness under our system of government of attributing finality to the action of the political departments and also the lack of satisfactory criteria for a judicial determination are dominant considerations." *Baker v. Carr,* 369 U.S. 186, 210, 82 S. Ct. 691, 706, 7 L. Ed. 2d 663, 682 (1962) (brackets in original) (quoting *Coleman v. Miller*, 307 U.S. 433, 454-55, 59 S. Ct. 972, 982, 83 L. Ed. 1385, 1397 (1939)).

> Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.

*Id.* at 211, 82 S. Ct. at 706, 7 L. Ed. 2d at 682. In other words, the Court necessarily has to undertake a separation of powers analysis in order to determine whether the political question doctrine precludes judicial resolution of a particular dispute.

The distinction between cases that do and do not involve nonjusticiable political questions can be seen by comparing our decision in *Bacon* with the Court of

Appeals' decision in *News & Observer Publishing Co. v. Easley*. In *Bacon,* which involved a challenge to "the constitutionality of the Governor's exercise of his clemency power under Article III, Section 5(6) of the Constitution of North Carolina," 353 N.C. at 698, 549 S.E.2d at 843, this Court stated that "a question may be held nonjusticiable under this doctrine if it involves 'a textually demonstrable constitutional commitment of the issue to a coordinate political department,' " *id.* at 717, 549 S.E.2d at 854 (quoting *Baker*, 369 U.S. at 217, 82 S. Ct. at 710, 7 L. Ed. 2d at 686). As a result of the fact that "Article III, Section 5(6) of the State Constitution expressly commits the substance of the clemency power to the sole discretion of the Governor," we concluded that, "beyond the minimal safeguards applied to state clemency procedures," "judicial review of the exercise of clemency power would unreasonably disrupt a core power of the executive." *Id.* at 717, 549 S.E.2d at 854. On the other hand, in *News & Observer Publishing Co.*, which also dealt with clemency-related issues, the Court of Appeals concluded that "the question before the Court is whether the [*News & Observer*] is entitled, under the Public Records Law, to certain clemency records within the possession of the Governor," 182 N.C. App. at 19, 641 S.E.2d at 702; determined that "[t]he answer to that question turns not on a political question, but on the meaning of our constitution's proviso that the Governor's power is subject to legislation 'relative to the manner of applying for pardons,' " *id.* at 19, 641 S.E.2d at 702 (quoting N.C. Const. art. III, § 5(6)); and noted that "[t]he principle that questions of constitutional and statutory interpretation are within the

subject matter jurisdiction of the judiciary is just as well established and fundamental to the operation of our government as the doctrine of separation of powers," *id.* at 19, 641 S.E.2d at 702 (citations omitted). As a result, in order to resolve the justiciability issue, we must decide whether the Governor is seeking to have the judicial branch interfere with an issue committed to the sole discretion of the General Assembly or whether the Governor is seeking to have the Court undertake the usual role performed by a judicial body, which is to ascertain the meaning of an applicable legal principle, such as that embodied in N.C. Const. art. III, § 5(4).

As the briefs that he has submitted for our consideration clearly reflect, the Governor has not challenged the General Assembly's decision to merge the State Board of Elections and the Ethics Commission into the Bipartisan State Board, which is, as he appears to concede, a decision committed to the sole discretion of the General Assembly. *See* N.C. Const. art. III, § 5(10) (providing that "[t]he General Assembly shall prescribe the functions, powers, and duties of the administrative departments and agencies of the State and may alter them from time to time"). Instead, the Governor has alleged in his complaint that the enactment of Session Law 2017-6 "curtail[ed], in significant ways[, his] executive powers." More specifically, the Governor has alleged that "Session Law 2017-6 violate[s] the separation of powers by preventing the Governor from performing his core function under the North Carolina Constitution to 'take care that the laws be faithfully executed,' " quoting Article III,

Section 5(4) of the North Carolina Constitution. As a result, the Governor is not challenging the General Assembly's decision to "prescribe the functions, powers, and duties of the administrative departments and agencies of the State" by merging the State Board of Elections and the Ethics Commission into the Bipartisan State Board and prescribing what the Bipartisan State Board is required or permitted to do; instead, he is challenging the extent, if any, to which the statutory provisions governing the manner in which the Bipartisan State Board is constituted and required to operate pursuant to Session Law 2017-6 impermissibly encroach upon his constitutionally established executive authority to see that the laws are faithfully executed.

As this Court explained in *McCrory*, "the separation of powers clause requires that, as the three branches of government carry out their duties, one branch will not prevent another branch from performing its core functions." 368 N.C. at 636, 781 S.E.2d at 250 (citing *Hart v. State*, 368 N.C. 122, 126-27, 774 S.E.2d 281, 285 (2015)). In that case, this Court considered former Governor McCrory's "challenge [to the constitutionality of] legislation that authorize[d] the General Assembly to appoint a majority of the voting members of three administrative commissions" on the grounds "that, by giving itself the power to appoint commission members, the General Assembly ha[d] usurped Governor McCrory's constitutional appointment power and interfered with his ability to take care that the laws are faithfully executed," *id.* at 636, 781 S.E.2d at 250, and noted that, in order to decide the issues before it in that

case, the Court was required to "construe[ ] and appl[y] . . . provisions of the Constitution of North Carolina," *id.* at 638-39, 781 S.E.2d at 252 (citations omitted). Instead of holding that Governor McCrory's challenge to the validity of the legislation in question involved a nonjusticiable political question, we addressed Governor McCrory's claim on the merits.[5]

Our implicit decision that Governor McCrory's claim was justiciable is fully consistent with the literal language contained in Article III, Section 5(10) of the North Carolina Constitution, which refers to "the functions, powers, and duties of the administrative departments and agencies of the State," or, in other words, to what the agencies in question are supposed to do, rather than the extent to which the Governor has sufficient control over those departments and agencies to ensure "that the laws be faithfully executed," N.C. Const. art. III, § 5(4). Alternatively, even if one does not accept this understanding of the scope of the General Assembly's authority under Article III, Section 5(10), we continue to have the authority to decide this case because the General Assembly's authority pursuant to Article III, Section 5(10) is necessarily constrained by the limits placed upon that authority by other constitutional provisions. *See Buckley v. Valeo*, 424 U.S. 1, 132, 96 S. Ct. 612, 688, 46 L. Ed. 2d 659, 752 (1976) (noting that "Congress has plenary authority in all areas in which it has substantive legislative jurisdiction, so long as the exercise of that

---

[5] The political question doctrine was not invoked by any party to *McCrory* or explicitly discussed in our opinion.

authority does not offend some other constitutional restriction") (citation omitted). For this reason, the Governor's authority to appoint constitutional officers pursuant to Article III, Section 5(8) is subject to the constitutional provisions limiting dual office holding, N.C. Const. art. VI, § 9, and separation of powers, *State ex rel. Wallace*, 304 N.C. at 608, 286 S.E.2d at 888 (holding that the appointment of sitting legislators to membership on administrative commissions constitutes a separation-of-powers violation); the General Assembly's exclusive authority to classify property for taxation-related purposes does not allow more favorable tax classification treatment for one religious organization as compared to another in light of the constitutional guarantees of religious liberty and equal protection, *see* N.C. Const. art. 1, §§ 13 and 19; *Heritage Village Church & Missionary Fellowship, Inc., v. State*, 299 N.C. 399, 406 n. 1, 263 S.E.2d 726, 730 n. 1 (1980); and the General Assembly's exclusive authority to enact criminal statutes, N.C. Const. art. II, § 1 (providing that the legislative power of the State is to be exercised by the General Assembly), does not authorize the enactment of ex post facto laws in violation of Article I, Section 16. As a result, under either interpretation of the relevant constitutional language, the authority granted to the General Assembly pursuant to Article III, Section 5(10)[6] is

---

[6] The same analysis applies to Article III, Section 11 of the North Carolina Constitution (providing that, "[n]ot later than July 1, 1975, all administrative departments, agencies, and offices of the State and their respective functions, powers, and duties shall be allocated by law among and within not more than 25 principal administrative departments so as to group them as far as practicable according to major purposes"; "[r]egulatory, quasi-judicial, and temporary agencies may, but need not, be allocated within a principal department."

subject to other constitutional limitations, including the explicit textual limitation contained in Article III, Section 5(4).[7]

In this case, like *McCrory*, the Governor has alleged that the General Assembly "usurped [his] constitutional . . . power and interfered with his ability to take care that the laws are faithfully executed," *id.* at 636, 781 S.E.2d at 250, requiring us, consistent with *McCrory*, to "construe[ ] and appl[y] . . . provisions of the Constitution of North Carolina," *id.* at 638, 781 S.E.2d at 252. In other words, unlike *Bacon*, this case involves a conflict between two competing constitutional provisions. For that reason, this case, like *McCrory*, involves an issue of constitutional interpretation, which this Court has a duty to decide utilizing the manageable judicial standard enunciated in that decision, rather than a nonjusticiable political question arising from nothing more than a policy dispute. *See* N.C. Const. art. IV, § 1. A decision to reach a contrary result would necessarily compel the conclusion that both *McCrory*

---

[7] Although the legislative leadership has also suggested that the Governor is precluded from seeking relief from the judicial branch for justiciability and exhaustion-related reasons by virtue of the fact that he is entitled, under Article III, Section 5(10) of the North Carolina Constitution, to "make such changes in the allocation of offices and agencies and in the allocation of those functions, powers, and duties as he considers necessary for efficient administration," we do not find this argument persuasive given that the constitutional provision in question deals with the "functions, powers, and duties" of "the administrative departments and agencies of the State" rather than with the extent to which the Governor has the ability to control their operations in order to "take care that the laws be faithfully executed" pursuant to Article III, Section 5(4) of the North Carolina Constitution, and given that such changes become ineffective in the event that they are, prior to adjournment of the relevant legislative session "sine die," "specifically disapproved of by resolution of either house of the General Assembly or specifically modified by joint resolution of both house of the General Assembly."

and *Wallace* were wrongly decided and sharply limit, if not eviscerate, the ability of executive branch officials to advance separation-of-powers claims. As a result, the panel erred by dismissing the Governor's complaint for lack of subject matter jurisdiction.[8]

In order to have standing to maintain this case, the Governor was required to allege that he had suffered an injury as a result of the enactment of Session Law 2017-6 or, in other words, that he had "a personal stake in the outcome of the controversy." *Mangum*, 362 N.C. at 642, 669 S.E.2d at 282 (quoting *Stanley v. Dep't of Conservation & Dev.*, 284 N.C. 15, 28, 199 S.E.2d 641, 650 (1973)) (citing N.C. Const. art. I, § 18). This Court held in *McCrory* that the Governor had standing to challenge the legislation at issue in that case on the grounds that it "interfered with his ability to take care that the laws are faithfully executed." 368 N.C. at 636, 781 S.E.2d at 250. Similarly, as is evidenced by the allegations set out in his complaint, the Governor has clearly asserted the existence of a "personal stake in the outcome of the controversy" in this case. *Mangum*, 362 N.C. at 642, 669 S.E.2d at 282. Simply put, if a sitting Governor lacks standing to maintain a separation-of-powers claim predicated on the theory that legislation impermissibly interferes with the authority constitutionally committed to the person holding that office, we have difficulty

---

[8] The result that we have reached with respect to the political question issue does not amount to a determination that Article III, Section 5(4) of the North Carolina Constitution trumps Article III, Section 5(10) of the North Carolina Constitution. Instead, we believe that these constitutional provisions address different issues and can be harmonized with each other so that each of them is, as should be the case, given independent meaning.

ascertaining who would ever have standing to assert such a claim. Apart from their contention that the claim advanced in the Governor's complaint is a nonjusticiable political question, which we have already rejected, the legislative leadership does not appear to explicitly contend that the Governor lacks the necessary personal stake in the outcome of this controversy to deprive him of standing.[9] As a result, we hold that the panel erred by dismissing Governor Cooper's complaint for lack of standing to the extent that it did so.

Finally, we must address the merits of the Governor's claim that Session Law 2017-6 "unconstitutionally infringe[s] on the Governor's executive powers in violation of separation of powers."[10] "We review constitutional questions de novo." *McCrory*,

---

[9] The legislative leadership does assert that the Governor lacks standing to maintain the present action because his alleged injuries did not result from the enactment of Session Law 2017-6. As we understand this argument, the legislative leadership contends that the injury of which the Governor complains was worked by prior legislative enactments rather than by the enactment of Session Law 2017-6. In spite of the fact that certain aspects of the manner in which the Bipartisan State Board is to be selected were reflected in prior statutory provisions, the record clearly shows that the composition of the Bipartisan State Board and the manner in which the members of the Bipartisan State Board and the Executive Director are selected, which is the focus of the Governor's separation of powers claim, resulted from the enactment of Session Law 2017-6 and represented a substantial change from prior law. Thus, we believe that the Governor is, in fact, seeking relief from an alleged injury to his constitutional executive authority stemming from the enactment of Session Law 2017-6 and that effective relief for that injury can be provided in the event that the Governor's constitutional claim proves successful on the merits.

[10] In their initial brief, the legislative leadership urged us to refrain from reaching the merits in the event that we rejected their justiciability and standing contentions on the grounds that this Court is an appellate court and that the trial court had not had an opportunity to consider and address the merits of the Governor's challenge to the constitutionality of Session Law 2017-6. In view of our agreement with the legislative leadership that, in virtually all circumstances, this Court benefits from reviewing trial court decisions rather than exercising our supervisory authority in what amounts to a vacuum, we

368 N.C. at 639, 781 S.E.2d at 252 (citing *Piedmont Triad Reg'l Water Auth. v. Sumner Hills, Inc.,* 353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001)). "In exercising de novo review, we presume that laws enacted by the General Assembly are constitutional, and we will not declare a law invalid unless we determine that it is unconstitutional beyond a reasonable doubt." *Id.* at 639, 781 S.E.2d at 252 (first citing *Hart,* 368 N.C. at 131, 774 S.E.2d at 287-88; then citing *Baker v. Martin,* 330 N.C. 331, 334-35, 410 S.E.2d 887, 889 (1991)). In order to "determine whether the violation is plain and clear, we look to the text of the constitution, the historical context in which the people of North Carolina adopted the applicable constitutional provision, and our precedents." *Id.* at 639, 781 S.E.2d at 252 (citations omitted). A facial challenge to the constitutionality of legislation enacted by the General Assembly, which is the type of challenge asserted in the Governor's complaint, "is the most difficult challenge to mount successfully." *Hart,* 368 N.C. at 131, 774 S.E.2d at 288 (citing *Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs,* 363 N.C. 500, 502, 681 S.E.2d 278, 280 (2009)).

As we have already noted, the North Carolina Constitution, unlike the United States Constitution, contains an explicit separation-of-powers provision. *See* N.C. Const. art. I, § 6 (stating that "[t]he legislative, executive, and supreme judicial

---

afforded the panel an opportunity to make a determination on the merits in our certification order. Having had the benefit of what is, in any realistic sense, a decision by the panel with respect to the merits of the Governor's claim, we believe that we are now in a position to evaluate the substantive validity of the Governor's challenge to Session Law 2017-6.

powers of the State government shall be forever separate and distinct from each other"). For that and other reasons, "the separation of powers doctrine is well established under North Carolina law." *Bacon*, 353 N.C. at 716, 549 S.E.2d at 854 (citing, *inter alia, State ex rel. Wallace*, 304 N.C. at 595-601, 286 S.E.2d at 81-84 (stating at 304 N.C. at 595, 286 S.E.2d at 81, that "each of our constitutions has explicitly embraced the doctrine of separation of powers")). As we explained in *McCrory*, separation-of-powers violations can occur "when one branch exercises power that the constitution vests exclusively in another branch" or "when the actions of one branch prevent another branch from performing its constitutional duties." *McCrory*, 368 N.C. at 645, 781 S.E.2d at 256.

This Court has held that Article III, Section 5(4) of the North Carolina Constitution requires "the Governor [to] have enough control over" commissions or boards that "are primarily administrative or executive in character" "to perform his [or her] constitutional duty," *id.* at 645-46, 781 S.E.2d at 256, with the sufficiency of the Governor's "degree of control" "depend[ing] on his [or her] ability to appoint the commissioners, to supervise their day-to-day activities and to remove them from office," *id.* at 646, 781 S.E.2d at 256. In view of the fact that "each statutory scheme" is different, "[w]e cannot adopt a categorical rule that would resolve every separation of powers challenge" and "must resolve each challenge by carefully examining its specific factual and legal context." *Id.* at 646-47, 781 S.E.2d at 257. In holding that the legislation at issue in *McCrory* violated Article III, Section 5(4) of the North

Carolina Constitution, we noted that the General Assembly had "appoint[ed] executive officers that the Governor ha[d] little power to remove" and left "the Governor with little control over the views and priorities of the officers that the General Assembly appoint[ed]." *Id.* at 647, 781 S.E.2d at 257.

The test adopted in *McCrory* is functional, rather than formulaic, in nature. Although we did not explicitly define "control" for separation-of-powers purposes in *McCrory*, we have no doubt that the relevant constitutional provision, instead of simply contemplating that the Governor will have the ability to preclude others from forcing him or her to execute the laws in a manner to which he or she objects, also contemplates that the Governor will have the ability to affirmatively implement the policy decisions that executive branch agencies subject to his or her control are allowed, through delegation from the General Assembly, to make as well. In the absence of such an understanding, the power of an executive branch agency to adopt rules and regulations could be rendered completely nugatory without any separation-of-powers violation having occurred.

The Bipartisan State Board established by Session Law 2017-6, which has responsibility for the enforcement of laws governing elections, campaign finance, lobbying, and ethics, clearly performs primarily executive, rather than legislative or judicial, functions.[11] *See id.* at 646, 781 S.E.2d at 256 (referring to "the final executive

---

[11] The basic functions, powers, and duties that the Bipartisan State Board is required to perform are, of course, outlined in statutory provisions enacted by the General Assembly. The General Assembly did not, however, make all of the policy-related decisions needed to

-31-

authority" that the three commissions at issue in that case "possess[ed]"). The Bipartisan State Board consists of eight members appointed by the Governor, four of whom must be members of the political party with the highest number of registered affiliates selected from a list of nominees provided by the chair of the party in question and four of whom must be members of the political party with the second highest number of registered affiliates selected from a list of nominees provided by the chair of the party in question. Ch. 6, sec. 4(c), 2017-2 N.C. Adv. Legis. Serv. at 23 (enacting N.C.G.S. § 163A-2 (2017)). In addition, Session Law 2017-6, like the legislation governing the agencies at issue in *McCrory*, precludes the Governor from removing members of the Bipartisan State Board in the absence of "misfeasance, malfeasance, or nonfeasance," *id.*, at 24 (enacting N.C.G.S. § 163A-2(c) (2017)); s*ee McCrory*, 368 N.C. at 646, 781 S.E.2d at 257 (stating that "the challenged legislation sharply

---

effectively administer the election, campaign finance, lobbying, and ethics laws. Instead, consistent with much modern legislation, the General Assembly has delegated to the members of the Bipartisan State Board the authority to make numerous discretionary decisions, including, but not limited to, the extent to which particular administrative rules and regulations should be adopted, N.C.G.S. § 163-22(a) and N.C.G.S. § 163-22.2; the extent to which jurisdiction should be asserted over election-related protests pending before county boards of elections, N.C.G.S. § 163-182.12; and the number and location of the early voting sites to be established in each county and the number of hours during which early voting will be allowed at each site, N.C.G.S. § 163-227.2. As a result, the General Assembly has, in the exercise of its authority to delegate the making of interstitial policy decisions to administrative agencies, given decision making responsibilities to the executive branch by way of the Bipartisan State Board. We refer to the ability of the executive branch to make these discretionary determinations as the effectuation of "the Governor's policy preferences" throughout the remainder of this opinion. The use of this expression should not be understood as suggesting that the Bipartisan State Board has the authority to make any policy decision that conflicts with or is not authorized by the General Assembly, subject to applicable constitutional limitations.

constrains the Governor's power to remove members of any of the three commissions, allowing him to do so only for cause") and limits the ability of persons who share the Governor's policy preferences to supervise the day-to-day activities of the Bipartisan State Board, at least in the short term, by ensuring that no one could be appointed to the position of Executive Director other than the General Assembly's appointee until May 2019. As was the case in *McCrory*, in which we determined that the General Assembly had exerted excessive control over certain executive agencies by depriving the Governor of "control over the views and priorities" of a majority of the members of the commissions at issue in that litigation, 368 N.C. at 647, 781 S.E.2d at 257, we conclude that the relevant provisions of Session Law 2017-6, when considered as a unified whole, "leave[ ] the Governor with little control over the views and priorities" of the Bipartisan State Board, *id.* at 647, 781 S.E.2d at 257, by requiring that a sufficient number of its members to block the implementation of the Governor's policy preferences be selected from a list of nominees chosen by the leader of the political party other than the one to which the Governor belongs,[12] limiting the extent to which

_____

[12] We are, of course, unable to conclude with absolute certainty that persons chosen by the chair of the opposing political party will invariably and in all instances act to thwart the Governor's policy preferences at every turn. However, we do not believe that the applicable standard of review, including the presumption of constitutionality, requires us to turn a blind eye to the functions appropriately performed by the leader of an opposition party in our system of government or to force the Governor to be subject to the uncertainty that will necessarily arise from a determination that the showing of an actual interference with the Governor's executive authority is a necessary prerequisite to his or her ability to challenge legislation as violative of Article III, Section 5(4) of the North Carolina Constitution. Utilizing similar logic, the Court held in *McCrory* that the Governor lacked sufficient control over the administrative commissions at issue in that case based upon the

individuals supportive of the Governor's policy preferences have the ability to supervise the activities of the Bipartisan State Board, and significantly constraining the Governor's ability to remove members of the Bipartisan State Board.

In seeking to persuade us to reach a different result, the legislative leadership has advanced a number of arguments, each of which we have carefully considered. Among other things, the legislative leadership asserts that the General Assembly has not retained ongoing supervision or control over the Bipartisan State Board given that none of its members are either legislators, as was the case in *Wallace*, or legislative appointees, as was the case in *McCrory*. This argument rests upon an overly narrow reading of *McCrory*, which focuses upon the practical ability of the Governor to ensure that the laws are faithfully executed rather than upon (1) the exact manner in which his or her ability to do so is impermissibly limited or (2) whether the impermissible interference stems from (a) direct legislative supervision or control or from (b) the operation of some other statutory provision. Put another way, the separation-of-powers violations noted in *Wallace* and *McCrory* do not constitute the only ways in which the Governor's obligation to "faithfully execute the laws" can be the subject of impermissible interference. Instead, as *McCrory* clearly indicates, the relevant issue in a separation-of-powers dispute is whether, based upon a case-by-case analysis of the extent to which the Governor is entitled to appoint,

fact that a majority of appointments had been made by the members of the General Assembly. 368 N.C. at 647, 781 S.E.2d at 248. As a result, our decision in this case is fully consistent with the applicable standard of review.

supervise, and remove the relevant executive officials, the challenged legislation impermissibly interferes with the Governor's ability to execute the laws in any manner.

The General Assembly does, of course, have the authority pursuant to Article III, Section 5(10) of the North Carolina Constitution to specify the number of members of an executive branch commission. Moreover, the General Assembly clearly has the authority to establish qualifications for commission membership, to make certain persons ex officio members of the commission, and to mandate that differing policy preferences be reflected in the commission's membership.[13] Similarly, the General Assembly has the undoubted authority to prescribe the commission's functions, powers and duties and to determine the substance of the laws and policies that the commission is called upon to execute. Finally, the General Assembly has the authority to provide the commission with a reasonable degree of independence from short-term political interference[14] and to foster the making of independent, non-

---

[13] Our holding in this case does not hinge upon the fact that the General Assembly has required that half of the members of the Bipartisan State Board be members of a political party other than that to which the Governor belongs; instead, our decision rests upon the totality of the limitations imposed upon the Governor's appointment, supervisory, and removal authority set out in Session Law 2017-6.

[14] The Court noted in *McCrory* that the General Assembly "insulate[d] the Coal Ash Management Commission from executive branch control even more by requiring the commission to exercise its powers and duties 'independently,' without the 'supervision, direction, or control' of the Division of Emergency Management or the Department of Public Safety." 368 N.C. at 646, 781 S.E.2d at 257. Needless to say, we did not hold in *McCrory*, and do not hold now, that the entire concept of an "independent" agency is totally foreign to North Carolina constitutional law. Instead, the degree of independence with which an agency

partisan decisions. All of these determinations are policy-related decisions committed to the General Assembly rather than to this Court. The General Assembly cannot, however, consistent with the textual command contained in Article III, Section 5(4) of the North Carolina Constitution, structure an executive branch commission in such a manner that the Governor is unable, within a reasonable period of time, to "take care that the laws be faithfully executed" because he or she is required to appoint half of the commission members from a list of nominees consisting of individuals who are, in all likelihood, not supportive of, if not openly opposed to, his or her policy preferences while having limited supervisory control over the agency and circumscribed removal authority over commission members. An agency structured in that manner "leaves the Governor with little control over the views and priorities of the [majority of] officers" and prevents the Governor from having "the final say on how to execute the laws." *McCrory*, 368 N.C. at 647, 781 S.E.2d at 257. As a result, the manner in which the membership of the Bipartisan State Board is structured and operates under Session Law 2017-6 impermissibly, facially, and beyond a reasonable doubt interferes with the Governor's ability to ensure that the laws are faithfully executed as required by Article III, Section 5(4) of the North Carolina. *Id.*

---

is required to operate is simply a factor that must be considered in making the required separation-of-powers determination.

In addition to challenging the validity of the provisions of Session Law 2017-6 governing the composition of the Bipartisan State Board, the Governor has also challenged the statutory provisions "creat[ing] the position of Executive Director of the [Bipartisan] State Board" and making the Executive Director, who is designated as the "chief State elections official," "responsible for staffing, administration, and execution of the State Board's decisions and orders" and for performing "such other responsibilities as may be assigned by the State Board." Ch. 6, sec. 4(c), 2017-2 N.C. Adv. Legis. Serv. at 26 (enacting N.C.G.S § 163A-6 (a), (c), (d) (2017)). Although the General Assembly appointed the individual then serving as the Executive Director of the State Board of Elections to be the Executive Director of the Bipartisan State Board for a term of office lasting until at least May 2019, *see id.*, sec. 17, at 34, the Bipartisan State Board is entitled to appoint an Executive Director by a majority vote after that point, N.C.G.S. § 163A-6 (2017). As a result, the relevant provisions of Session Law 2017-6 ensure that the Governor will not have any control over the identity of the Executive Director of the Bipartisan State Board until May 2019 and, perhaps, even after that time, given the manner in which the General Assembly has structured the membership of the Bipartisan State Board in Session Law 2017-6, *id.* § 163A-2.

Although the legislative leadership argues that, rather than appointing the Executive Director of the Bipartisan State Board, the General Assembly simply extended the term of the Executive Director of the State Board of Elections, we do not

find that argument persuasive. As an initial matter, given that Session Law 2017-6 abolished the State Board of Elections, the position of Executive Director of that body no longer exists. Instead, Session Law 2017-6 expressly "create[s] the position of Executive Director of the [Bipartisan] State Board," *id*. § 163-6(a), clearly indicating that the position of Executive Director of the Bipartisan State Board is a new office rather than the continuation of an existing one. In addition, given the General Assembly's decision to combine the functions previously performed by the State Board of Elections and the Ethics Commission into the functions to be performed by a single agency, the duties assigned to the Executive Director of the Bipartisan State Board are necessarily more extensive than the duties assigned to the Executive Director of the State Board of Elections. *See* Ch. 6, sec. 4(c), at 26 (enacting N.C.G.S. § 163A-1 (2017)). As a result, we cannot agree that the General Assembly's decision to designate the Executive Director of the State Board of Elections as the Executive Director of the Bipartisan State Board constitutes nothing more than the exercise of the General Assembly's authority to extend the term of an existing officeholder in order to achieve some valid public policy goal.

As the Bipartisan State Board is structured in Session Law 2017-6, the General Assembly's decision to appoint the Executive Director of the Bipartisan State Board and to preclude the Bipartisan State Board from either selecting a new Executive Director prior to May 2019 or removing the Executive Director in the absence of "cause," N.C.G.S. § 163A-6(b), could impermissibly constrain the

Governor's ability to ensure that the laws are faithfully executed. *See McCrory*, 368 N.C. at 645-46, 781 S.E.2d at 256-57. On the other hand, in the event that the membership of the Bipartisan State Board is structured in such a manner as to pass constitutional muster under Article III, Section 5(4) of the North Carolina Constitution and the Board is given adequate control over the manner in which the duties assigned to the Executive Director are performed, the Bipartisan State Board's ability to supervise and control the actions of the Executive Director might suffice to give the Governor adequate control over the Executive Director's activities, which appear to be primarily administrative in nature,[15] for separation-of-powers purposes.

---

[15] In seeking to persuade us to hold that the provisions of Session Law 2017-6 governing the appointment of the Executive Director, standing alone, work a separation-of-powers violation, the Governor has pointed to a number of statutory provisions assigning various responsibilities to the Executive Director and argued that his lack of control over the manner in which the Executive Director carries out these responsibilities impermissibly impairs his ability to ensure that the laws are faithfully executed. A number of these statutory provisions, including those portions of N.C.G.S. § 163-23 requiring the Executive Director to notify candidates and treasurers of the dates by which certain reports must be filed, that required reports had not been filed in a timely manner, and that certain complaints had been filed, and the provision of N.C.G.S. § 163-278.24 requiring the Executive Director to examine each report to determine if it complies with the relevant legal requirements, strike us as primarily ministerial, rather than discretionary, in nature. Although other statutory provisions do, as the Governor suggests, appear to authorize the Executive Director to take action that is discretionary in nature, *see, eg.,* N.C.G.S. § 163-271 (authorizing the Executive Director to take action in the event that certain emergencies affecting the holding of an election have occurred); N.C.G.S. § 163-132.4 (authorizing the Executive Director to promulgate directives to county boards of election); and N.C.G.S. § 163-278.23 (authorizing the Executive Director to issue written advisory opinions concerning campaign finance issues upon which candidates and treasurers are entitled to rely), the scope of the Executive Director's authority to engage in these actions may well be limited by other statutory provisions, including, for example, N.C.G.S. § 163A-6(c), which makes the Executive Director "responsible for staffing, administration, and execution of the [Bipartisan] State Board's decisions and orders" and "perform[ing] such other responsibilities as may be assigned by the [Bipartisan] State Board."

For that reason, an interim appointment to the position of Executive Director of the Bipartisan State Board made by the General Assembly for a limited term might not constitute a separation-of-powers violation in the event that the Governor otherwise has sufficient control over the Bipartisan State Board. For that reason, given our determination that, in light of the totality of the circumstances, the manner in which the members of the Bipartisan State Board must be selected pursuant to Session Law 2017-6 is constitutionally invalid, we need not reach the issue of whether the provisions governing the selection of the Executive Director constitute a separate violation of Article III, Section 5(4) of the North Carolina Constitution at this time and decline to do so.

Finally, the Governor has questioned the validity of the provisions of Session Law 2017-6 requiring that the office of the chair of the Bipartisan State Board be rotated between the state's two largest political parties and the provisions of Session Law 2017-6 restructuring the county boards of elections. Among other things, the Governor contends that the restructuring of the county boards of elections worked by Session Law 2017-6 "interferes with the executive function by creating deadlocked structures" and argues that the manner in which the county boards of elections are structured, coupled with the similar provisions governing the structure of the Bipartisan State Board, are likely to have the effect of thwarting the implementation of any particular Governor's election law-related policy preferences given that both boards will have a sufficient number of members who are unlikely to share the

Governor's policy views to preclude the implementation of his or her preferred method of executing the elections laws. Although we agree that the provisions of Session Law 2016-7 governing the selection of the chair of the Bipartisan State Board and the manner in which the county boards of elections are structured have the effect of compounding the separation-of-powers violation which we have identified earlier in this opinion, we further note that the Governor has not argued before this Court that either of these sets of provisions, taken in isolation, work an independent separation-of-powers violation. In light of the manner in which the Governor has argued these issues before this Court and our decision to invalidate the provisions of Session Law 2017-6 relating to the composition of the Bipartisan State Board, we express no opinion concerning the extent, if any, to which an independent separation-of-powers challenge relating to provisions of Session Law 2017-6 governing the rotation of the office of chair of the Bipartisan State Board among the two largest political parties or the provisions of Session Law 2017-6 governing the composition of the county boards of elections would have merit.

As we have already noted, the General Assembly noted an appeal from the temporary restraining order that the panel entered following the filing of the Governor's complaint. However, given that this temporary restraining order was dissolved relatively shortly after its entry, any decision that we might make with respect to its validity "cannot have any practical effect on the existing controversy." *Roberts v. Madison Cty Realtors Ass'n*, 344 N.C. 394, 398-399, 474 S.E.2d 783, 787

(1996). Moreover, since we conclude that the issues that had to be addressed during the proceedings leading to the entry of the challenged temporary restraining order are unlikely to recur, we do not believe that the legislative leadership's challenge to the entry of the temporary restraining order is "capable of repetition, yet evading review." *See Shell Island Homeowners Ass'n v. Tomlinson*, 134 N.C. App. 286, 292, 517 S.E.2d 401, 405 (1999) (stating that "[a]n otherwise moot claim falls within this exception where '(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again' " (quoting *Ballard v. Weast*, 121 N.C. App. 391, 394, 465 S.E.2d 565, 568 (alterations in the original), *appeal dismissed and disc. rev. denied*, 343 N.C. 304, 471 S.E.2d 66 (1996))). Similarly, given that the temporary restraining order has been dissolved and that we have decided the Governor's constitutional claim on the merits, we are not persuaded that a decision to address the legislative leadership's challenge to the temporary restraining order would, at this point, serve the "public interest." *Cape Fear River Watch v. N.C. Envtl. Mgmt. Comm'n*, 368 N.C. 92, 100, 772 S.E.2d 445, 450 (2015) (declining to reach the merits of an obviously significant issue relating to the regulatory treatment of coal ash lagoons because any decision to do so would not "have any practical impact"). For all of these reasons, the legislative leadership's appeal from the temporary restraining order is dismissed as moot.

Thus, we hold that the panel erred by dismissing the Governor's complaint. Simply put, the claim asserted in the Governor's complaint does not raise a nonjusticiable political question, and the Governor clearly has standing to assert the claim that he has presented for consideration by the judicial branch. In addition, for the reasons set forth in more detail above, the provisions of Session Law 2017-6 concerning the membership of and appointments to the Bipartisan State Board, taken in context with the other provisions of that legislation, impermissibly interfere with the Governor's ability to faithfully execute the laws in violation of Article III, Section 5(4) of the North Carolina Constitution. Finally, the legislative leadership's appeal from the 28 April 2017 temporary restraining order is moot and does not come within the proper scope of either of the exceptions to the mootness doctrine upon which the legislative leadership relies. As a result, (1) the panel's 1 June 2017 order is reversed, with this case being remanded to the panel for further proceedings not inconsistent with this opinion, including the entry of a final judgment on the merits, and (2) the legislative leadership's appeal from the 28 April 2017 temporary restraining order is dismissed as moot.

ORDER ENTERED ON 1 JUNE 2017 REVERSED AND REMANDED; APPEAL FROM ORDER ENTERED ON 28 APRIL 2017 DISMISSED AS MOOT.

Chief Justice MARTIN dissenting.

The majority opinion imposes a constitutional requirement that the Governor be able to appoint a majority of the members of the Bipartisan State Board of Elections and Ethics Enforcement from his own political party. In so doing, the majority deviates from our holding in *State ex rel. McCrory v. Berger*, 368 N.C. 633, 781 S.E.2d 248 (2016). Because the majority opinion impermissibly constrains the General Assembly's constitutional authority to determine the structure of state administrative bodies, I respectfully dissent.

We must resolve every separation of powers challenge "by carefully examining its specific factual and legal context." *Id.* at 646-47, 781 S.E.2d at 257. The type of separation of powers violation that the Governor alleges here occurs "when the actions of one branch prevent another branch from performing its constitutional duties." *Id.* at 645, 781 S.E.2d at 256 (citing *Bacon v. Lee*, 353 N.C. 696, 715, 549 S.E.2d 840, 853, *cert. denied*, 533 U.S. 975, 122 S. Ct. 22 (2001)). When this type of violation is alleged, we must determine whether the Governor has "enough control" over administrative bodies that have final executive authority to be able to perform his constitutional duties. *Id.* at 646, 781 S.E.2d at 256. *McCrory* set forth a functional analysis to be applied in this context, one that focuses not on the precise mechanism by which the Governor's power is allegedly interfered with but instead on the extent to which the challenged legislation limits the Governor's ability to perform a core executive duty. *See id.* at 645-47, 781 S.E.2d at 256-57.

To determine whether the Governor had "enough control" under the circumstances of *McCrory*, we noted several aspects of that case that were relevant to our analysis. There, each commission created by the challenged legislation—specifically, the Coal Ash Management Commission, the Mining Commission, and the Oil and Gas Commission—"ha[d] final authority over executive branch decisions." *Id.* at 645, 781 S.E.2d at 256. The General Assembly appointed a majority of the voting members of each of the three commissions. *See id.* at 646, 781 S.E.2d at 256. And the challenged legislation allowed the Governor to remove commission members only for cause. *Id.* at 646, 781 S.E.2d at 257. By having majority control over commissions with final executive authority, the General Assembly prevented the Governor from performing his constitutional duty to take care that the laws be faithfully executed, and the General Assembly retained too much control over that power through its legislative appointments. *Id.* at 647, 781 S.E.2d at 257 (citing *Bacon*, 353 N.C. at 717-18, 549 S.E.2d at 854; and *State ex rel. Wallace v. Bone*, 304 N.C. 591, 608, 286 S.E.2d 79, 88 (1982)); *see also* N.C. Const. art. III, § 5(4) ("The Governor shall take care that the laws be faithfully executed.").

*McCrory* therefore clarified that the Governor must have "enough control" over a body with final executive authority, such as by an appropriate combination of appointment and removal powers, to ensure that the laws are faithfully executed. Contrary to what the majority suggests, however, *McCrory* did not mandate that the Governor be able to appoint a *majority* of voting members who share his views and

priorities to every executive branch board or commission. Nor did it say that the Governor himself had to have "the final say on how to execute the laws." *Cf. McCrory*, 368 N.C. at 647, 781 S.E.2d at 257 (referring to "a *commission* that has the final say on how to execute the laws" (emphasis added)). As the majority says, *McCrory* did essentially hold that legislation is unconstitutional when it "leaves the Governor with little control over the views and priorities of the [majority of] officers" on an executive branch board or commission, at least when (as in *McCrory*) only one other appointing authority is selecting that entire majority. *See id.* at 647, 781 S.E.2d at 257. But that is just another way of saying that, in that circumstance, the Governor may not be left with a *minority* of appointees.

In this case, even if having to appoint half of the members of the Bipartisan State Board from a list provided by the chair of the opposition party is tantamount to those members being appointed by someone else, that still leaves the Governor with the ability to appoint *half* of the members from his own party—not a minority. The majority purports to simply apply *McCrory* but, like a funhouse mirror, distorts it instead.

As the three-judge panel recognized, Session Law 2017-6 gives the Governor enough control over the Board to avoid violating the separation of powers clause. "Enough control" does not mean unlimited or unbridled control. It does not necessarily mean majority control, either. It simply means that the Governor must not be compelled to enforce laws while having little or no control over how that

enforcement occurs. *See id.* at 647, 781 S.E.2d at 257. Here, the Board requires an affirmative vote of five of its members to take any action, Act of Apr. 11, 2017, ch. 6, sec. 4(c), 2017-2 N.C. Adv. Legis. Serv. 21, 25 (LexisNexis) (codified at N.C.G.S. § 163A-3(c) (2017)), and the Governor has enough control over the Board because he appoints half of its members from his own political party, *see id.* at 23 (codified at N.C.G.S. § 163A-2(a) (2017)). This means that the Board may not take any action without at least one vote of a member appointed by the Governor from his own party. At least one of those appointees, in other words, will cast the deciding vote when the Board is otherwise divided along party lines. Conversely, the four appointees from the Governor's party can veto any action that the opposition-party members of the Board otherwise want to take.[1]

Additionally, the Governor has the exclusive power to remove members of the Bipartisan State Board for misfeasance, malfeasance, or nonfeasance. *See id.* at 24 (codified at N.C.G.S. § 163A-2(c) (2017)). Although this is the same amount of removal power that the Governor had in *McCrory*, *see* 368 N.C. at 637-38, 781 S.E.2d at 251, and although it is limited to for-cause instances, this removal power is robust

---

[1] To the extent that the Governor argues that the structure of the Bipartisan State Board makes it likely to deadlock rather than reach a five-vote consensus, this argument is speculative and therefore not appropriate for consideration on a facial challenge. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449-50, 128 S. Ct. 1184, 1190 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."); *accord Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs*, 363 N.C. 500, 502, 681 S.E.2d 278, 280 (2009).

enough to address any concerns peculiar to this Board—namely, that Board members could violate the public trust by using their official positions for obviously malicious or purely partisan purposes. *See Malfeasance*, *Black's Law Dictionary* (10th ed. 2014) ("A wrongful, unlawful, or dishonest act; esp., wrongdoing or misconduct by a public official . . . ."). Giving the Governor the power to remove members *without* cause, moreover, would leave the Board open to political coercion. *Cf. Wiener v. United States*, 357 U.S. 349, 353, 355-56, 78 S. Ct. 1275, 1278, 1279 (1958) (reasoning that the War Claims Commission's need for insulation from political coercion weighed in favor of the President being able to remove Commission members only for cause).[2]

Let's not lose sight of the Board's purpose, which is to administer elections and adjudicate ethics complaints. The structure and makeup of the Board requires members to cooperate in a bipartisan way before taking any official action and encourages neutrality and fairness.[3] But, strangely, the majority opinion

---

[2] The majority also argues that, by selecting the most recent Executive Director of the prior State Board of Elections to be an interim Executive Director of the Bipartisan State Board until May 2019, Session Law 2017-6 "limits the ability of persons who share the Governor's policy preferences to supervise the day-to-day activities of the Bipartisan State Board." But the Executive Director does not supervise the Bipartisan State Board; in fact, the opposite is true. *See* Act of Apr. 11, 2017, ch. 6, sec. 4(c), 2017-2 N.C. Adv. Legis. Serv. 21, 26 (LexisNexis) (codified at N.C.G.S. § 163A-6(c) (2017)) (noting that the Executive Director is responsible for "staffing, administration, and execution of *the [Bipartisan] State Board's decisions and orders*," and also "perform[s] such other responsibilities *as may be assigned by the [Bipartisan] State Board*" (emphases added)). The majority seems to recognize this very fact when it concedes that the "Executive Director's activities . . . appear to be primarily administrative in nature."

[3] Preserving confidence in the political neutrality and operational independence in the

constitutionalizes a *partisan* makeup of the Bipartisan State Board, which threatens to inject political gamesmanship into the implementation of our election and ethics laws and undermines the neutrality inherent in an evenly divided bipartisan composition.

Indeed, in light of today's holding, the Federal Election Commission—which is the closest federal analogue to the Bipartisan State Board—would be unconstitutional under North Carolina law. The FEC is composed of six voting members, no more than three of whom may be from the same political party, and the voting members are appointed by the President and confirmed by the Senate. *See* 52 U.S.C. § 30106(a) (Supp. III 2015). Does the majority really believe that our state constitution prohibits neutral, bipartisan election boards?

It is beyond question that the courts should have "neither FORCE nor WILL but merely judgment." *United States v. Hatter*, 532 U.S. 557, 568, 121 S. Ct. 1782,

---

administration of elections is essential. *See Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S. Ct. 5, 7 (2006) (per curiam) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy."); *cf.* Christopher S. Elmendorf, *Election Commissions and Electoral Reform: An Overview*, 5 Election L.J. 425, 425 (2006) (describing the recent interest in creating "politically insulated bodies to administer elections" to avoid partisan favoritism during those elections); Richard L. Hasen, *Beyond the Margin of Litigation: Reforming U.S. Election Administration to Avoid Electoral Meltdown*, 62 Wash. & Lee L. Rev. 937, 978-89 (2005) (describing recent electoral controversies in the United States and advocating for nonpartisan election administration). The "specific factual . . . context" of *McCrory*—which involved complex areas of state environmental regulation—called for a substantial degree of executive oversight and policy discretion. *McCrory*, 368 N.C. at 646-47, 781 S.E.2d at 257. But the specific factual context of this case— which involves administration of election and ethics laws—calls for neutrality and independence.

1791 (2001) (quoting *The Federalist* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). "Our constitutionally assigned role is limited to a determination of whether the legislation is plainly and clearly prohibited by the constitution." *Hart v. State*, 368 N.C. 122, 127, 774 S.E.2d 281, 285 (2015); *see also Baker v. Martin*, 330 N.C. 331, 334, 410 S.E.2d 887, 889 (1991) (explaining that legislation will not be invalidated unless it is unconstitutional "beyond reasonable doubt" (quoting *Gardner v. City of Reidsville*, 269 N.C. 581, 595, 153 S.E.2d 139, 150 (1967))); *State ex rel. Martin v. Preston*, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989) ("[This Court] will not lightly assume that an act of the legislature violates the . . . Constitution . . . ."). By contrast, the General Assembly acts as the "arm of the electorate," *McCrory*, 368 N.C. at 639, 781 S.E.2d at 252 (quoting *Pope v. Easley*, 354 N.C. 544, 546, 556 S.E.2d 265, 267 (2001) (per curiam)), and is constitutionally empowered to organize the departments and agencies of our state government, *see* N.C. Const. art. II, § 1; *id.* art. III, § 5(10); *see also Wallace*, 304 N.C. at 595-96, 286 S.E.2d at 82. The General Assembly could, of course, choose to give the Governor the ability to appoint a majority of appointees, without any constraints, to any given executive branch board or commission. But doing so is the prerogative of the General Assembly, not of the courts. *See In re Alamance Cty. Ct. Facils.*, 329 N.C. 84, 95, 405 S.E.2d 125, 130 (1991) ("The courts have absolutely no authority to control or supervise the power vested by the Constitution in the General Assembly as a coordinate branch of the

government." (quoting *Person v. Bd. of State Tax Comm'rs,* 184 N.C. 499, 503, 115 S.E. 336, 339 (1922))).

I would hold that, by giving the Governor appointment and removal power over Bipartisan State Board members, and by allowing the Governor to appoint half of those members from his own political party, the General Assembly has satisfied the requirements established by our constitution. *See Hart,* 368 N.C. at 126, 774 S.E.2d at 284 ("If constitutional requirements are met, the wisdom of the legislation is a question for the General Assembly."); *McIntyre v. Clarkson,* 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961) ("The wisdom and expediency of a statute is for the legislative department, when acting entirely within constitutional limits."). The majority instead constitutionalizes a requirement that the Governor be able to appoint a majority of Bipartisan State Board members from his own political party—to a board responsible for administering our state's election and ethics laws, no less.[4] By doing so, this Court has encroached on the General Assembly's constitutional authority and placed the courts in the position of micromanaging the organization and reorganization of state government. Our decision in *McCrory* does not compel this result, and the prudential exercise of our limited role counsels against it. "Just as the legislative and executive branches of government are expected to operate within

---

[4] As the three-judge panel warned, giving the Governor the degree of control that he seeks will prevent the board from functioning like the former State Board of Elections did—as "an independent regulatory and quasi-judicial agency."

their constitutionally defined spheres, so must the courts." *Hart*, 368 N.C. at 126, 774 S.E.2d at 285.[5]  I therefore respectfully dissent.

Justice JACKSON joins in this dissenting opinion.

Justice NEWBY dissenting.

This case presents the question of whether the General Assembly has the authority to create an independent, bipartisan board to administer the laws of elections, ethics, lobbying, and campaign finance.  Because the state constitution expressly commits this specific power to the legislative branch, this Court lacks the authority to intervene; the issue presents a nonjusticiable political question.  In exercising judicial power under these circumstances, this Court violates the very separation-of-powers principle it claims to protect.  The Court strips the General Assembly of its historic, constitutionally prescribed authority to make the laws and creates a novel and sweeping constitutional power in the office of Governor—the authority to implement personal policy preferences.  In doing so, the Court ignores

---

[5] I share Justice Newby's concerns about the breadth of the majority opinion and its implications for judicial encroachment on the role of the General Assembly under "our tripartite system of government." *Bacon*, 353 N.C. at 712, 549 S.E.2d at 851.  I see these concerns as properly addressed in the context of analyzing the merits of the case.

the carefully crafted, express constitutional roles of the political branches and boldly inserts the judiciary into the political, legislative process. If the Court should reach the merits, I would agree with the analysis of Chief Justice Martin's dissent; however, because the trial court correctly held that this case presents a nonjusticiable political question, I dissent separately.

Under the state constitution, the General Assembly considers various policy alternatives, and those measures enacted become the laws. The Governor may influence the lawmaking process and can even veto a measure. Nevertheless, once the General Assembly passes a law, the constitution requires the Governor to "faithfully" execute "the laws." "The laws" are not the Governor's policy preferences, but are those measures enacted by the General Assembly.

I.

The idea of the judiciary preventing the legislature, through which the people act, from exercising its power is the most serious of judicial considerations. *State ex rel. McCrory v. Berger*, 368 N.C. 633, 650, 781 S.E.2d 248, 259 (2016) (Newby, J., concurring in part and dissenting in part). As the agent of the people's sovereign power, *State ex rel. Ewart v. Jones*, 116 N.C. 570, 570, 21 S.E. 787, 787 (1895), the General Assembly has the presumptive power to act, *State ex rel. Martin v. Preston*, 325 N.C. 438, 448, 385 S.E.2d 473, 478 (1989) ("[G]reat deference will be paid to acts of the legislature—the agent of the people for enacting laws."). Possessing plenary

power, the General Assembly is only limited by the express terms of the constitution. *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E.2d 888, 891-92 (1961).

When this Court strikes down an act of the General Assembly, it prevents an act of the people themselves. *Baker v. Martin*, 330 N.C. 331, 336-37, 410 S.E.2d 887, 890 (1991); *see also McIntyre*, 254 N.C. at 515, 119 S.E.2d at 891 ("The courts will not disturb an act of the law-making body unless it runs counter to a constitutional limitation or prohibition.").[1] A constitutional limitation upon the General Assembly must be expressed in the constitutional text. *Preston*, 325 N.C. at 448-49, 385 S.E.2d at 478 ("All power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution." (citations omitted)). Thus, a claim that a law is unconstitutional must surmount the

---

[1] *See, e.g.*, *Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 189, 581 S.E.2d 415, 429 (2003) ("By seeking to curb unlawful discrimination by regulating covered employers, the enabling legislation and the Ordinance have the practical effect of regulating labor, as forbidden by Article II, Section 24."); *State v. Elam*, 302 N.C. 157, 160, 273 S.E.2d 661, 664 (1981) (noting that the General Assembly "was without authority to enact G.S. 15A-1446(d)(6) [affecting appellate rules]," as doing so violated Article IV, Section 13(2), providing that "[t]he Supreme Court shall have exclusive authority to make rules of practice and procedure for the Appellate Division" (second alteration in original) (quoting N.C. Const. art. IV, § 13(2))); *Sir Walter Lodge, No. 411, I.O.O.F. v. Swain*, 217 N.C. 632, 637-38, 9 S.E.2d 365, 368-69 (1940) (General Assembly exceeded its power under Article V, Section 5 to grant tax exemptions for property held for certain purposes.); *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 6-7 (1787) (Statute directing that suits brought by claimants of property confiscated during the American Revolution should be dismissed exceeded General Assembly's lawmaking power, as it denied the right to trial by jury guaranteed under Section IX of the Declaration of Rights in the North Carolina Constitution of 1776.).

high bar imposed by the presumption of constitutionality and meet the highest quantum of proof, a showing that the statute is unconstitutional beyond a reasonable doubt. *Baker*, 330 N.C. at 334-37, 410 S.E.2d at 889-90.

## II.

Since 1776 our constitutions have recognized that all political power resides in the people, N.C. Const. art. I, § 2; N.C. Const. of 1868, art. I, § 2; N.C. Const. of 1776, Declaration of Rights § I, and is exercised through their elected officials in the General Assembly, N.C. Const. art. II, § 1; N.C. Const. of 1868, art. II, § 1; N.C. Const. of 1776, § I. *See Jones*, 116 N.C. at 570, 21 S.E. at 787; *see also* John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 95 (2d ed. 2013) [hereinafter *State Constitution*] ("The legislative power is vested in the General Assembly, so called because all the people are present there in the persons of their representatives."). The structure of the bicameral legislative branch itself diffuses its power, *see McCrory*, 368 N.C. at 653, 781 S.E.2d at 261, and the people themselves limit legislative power by express constitutional prohibitions, *see Baker*, 330 N.C. at 338-39, 410 S.E.2d at 891-92.

Accountable to the people, N.C. Const. art. II, §§ 3, 5, through the most frequent elections, *id.* art. II, §§ 2, 4, "[t]he legislative branch of government is without question 'the policy-making agency of our government . . . . The General Assembly is the 'policy-making agency' because it is a far more appropriate forum

than the courts for implementing policy-based changes to our laws," *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 169, 594 S.E.2d 1, 8 (2004) (quoting *McMichael v. Proctor,* 243 N.C. 479, 483, 91 S.E.2d 231, 234 (1956)). *See also McCrory*, 368 N.C. at 653, 781 S.E.2d at 261 ("The diversity within the [legislative] branch . . . ensures healthy review and significant debate of each proposed statute, the enactment of which frequently reaches final form through compromise.").

Article III vests primary executive power with the Governor. N.C. Const. art. III, § 1. Though each of our state constitutions has placed executive power in the Governor generally, *id.* art. III, § 1; N.C. Const. of 1868, art. III, §§ 1, 4; N.C. Const. of 1776, § XIX, the constitutional powers of the executive have always been divided among various officials, N.C. Const. art. III, §§ 7(1)-(2), 8, with the Governor acting as chief executive, *id.* art. III, §§ 1, 5, within a multimember executive branch. *See McCrory*, 368 N.C. at 655-57, 781 S.E.2d at 262-63.

Unlike the General Assembly, the Governor historically has only those powers expressly granted by the constitution. *E.g.*, N.C. Const. art. III, § 5 (outlining the "Duties of Governor"); N.C. Const. of 1868, art. III, § 6 ("to grant reprieves, commutations and pardons"); *id.*, art. III, § 9 ("to convene the General Assembly in extra session"); N.C. Const. of 1776, § XIX (including the "Power to draw for and apply such Sums of Money as shall be voted by the General Assembly" and to exercise clemency, "the Power of granting Pardons and Reprieves"). Among the express constitutional duties of the Governor is to "take care that the laws be faithfully

executed." N.C. Const. art. III, § 5(4). This provision does not create an independent, policymaking power in the Governor; it simply requires the Governor to enforce "the laws" as passed by the General Assembly. *See Winslow v. Morton*, 118 N.C. 486, 489-90, 24 S.E. 417, 418 (1896) (acknowledging that, when the constitution authorizes the General Assembly to legislate, the Governor, "as the constituted head of the executive department," is charged "with the duty of seeing that the statute is carried into effect"). Nowhere does the text of the constitution grant the Governor the authority to implement personal policy choices.

While Article III generally outlines executive authority, it nonetheless specifies numerous occasions when the legislature shares in the various responsibilities.[2] Only recently have the people, by constitutional amendment, allowed the Governor to participate in lawmaking through the power of gubernatorial veto. *See* Act of Mar. 8, 1995, ch. 5, secs. 3, 4, 1995 N.C. Sess. Laws 6, 8 (establishing referendum to amend the constitution to provide gubernatorial veto to take effect 1

---

[2] *See* N.C. Const. art. III, § 5(2) (Governor recommends to the General Assembly "such measures as he shall deem expedient."); *id.* art. III, § 5(3) (Governor prepares and recommends comprehensive budget to General Assembly for enactment and, after enactment, Governor shall effect the necessary economies to prevent deficits.); *id.* art. III, § 5(6) (Governor may grant clemency "subject to regulations prescribed by law relative to the manner of applying for pardons."); *id.* art. III, § 5(7) (Governor may convene General Assembly in extra session.); *id.* art. III, § 5(8) ("Governor shall nominate and by and with the advice and consent of a majority of the Senators appoint all officers whose appointments are not otherwise provided for."); *id.* art. III, § 6 (Lieutenant Governor "shall perform such additional duties as the General Assembly or the Governor may assign to him."), *id.* art. III, § 7(2) ("[R]espective duties [of the Council of State] shall be prescribed by law.").

January 1997). Nonetheless, a three-fifths vote in each legislative chamber can override a veto. N.C. Const. art. II, § 22(1). As illustrated by the gubernatorial veto provision, the constitutional text indicates the balance struck between the executive and legislative branches, granting the legislature the ultimate lawmaking authority. Only the people, by constitutional amendment, can change that power balance. *McCrory*, 368 N.C. at 654, 781 S.E.2d at 262.

This Court's decision in *Winslow v. Morton* illustrates how the aforementioned constitutional powers of the legislative and executive branches apply without conflict. In *Winslow* this Court reviewed the historic and express gubernatorial role of commander-in-chief of the militia. 118 N.C. at 488, 24 S.E. at 417. In comparing that role to the federal Executive, the Court noted that Congress, under the Federal Constitution, may provide by law for "raising, equipping and maintaining armies and navies" and "may make rules for the government of the land and naval forces." *Id.* at 489, 24 S.E. at 418 (citation omitted). "When Congress asserts its authority . . . within the purveiw [sic] of its powers the President is deprived of the supreme power of military head of the Government" and instead "incurs the obligation as Chief Executive to see that the laws made by the legislative branch of the government are faithfully executed." *Id.* at 489, 24 S.E. at 418 (citation omitted). In the same way,

> the Constitution of North Carolina (Art. XII, sec. 2) having authorized the Legislature "to provide for the organization, arming, equipping and discipline of the militia," where it passes an act in pursuance of this section, it imposes *pro tanto* a limit upon the incidental authority of the Governor,

as commander in chief and charges him, as the constituted head of the executive department (Article III, section 1), with the duty of seeing that the statute is carried into effect.

*Id.* at 489-90, 24 S.E. at 418 (citing N.C. Const. of 1868, art. III, § 1, and quoting *id.*, art. XII, § 2).

Synthesizing the executive's constitutional role as commander-in-chief with the legislature's lawmaking power, the Court concluded that the Governor could in his discretion "dismiss officers of the militia when his powers and duties are not defined by any legislative act." *Id.* at 490, 24 S.E. at 418 ("The power to dismiss being conferred by the constitutional provision and affirmed by statute, it is clear that the Governor may still lawfully exercise it, unless the Legislature, by virtue of its authority to organize and discipline the militia, has either expressly or by implication repealed the statute."). Once the General Assembly limited the Governor's powers and duties by statute, however, he was constitutionally required to execute the laws as enacted. *Winslow* further illustrates the general principle that the specific and express allocations of authority between the branches as established by the text must be construed harmoniously.

## III.

"The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. The separation-of-powers clause is located within the Declaration of Rights of

Article I, an expressive yet nonexhaustive list of protections afforded to citizens against government intrusion, along with "the ideological premises that underlie the structure of government." *State Constitution* 46. The placement of the clause there suggests that keeping each branch within its described spheres protects the people by limiting overall governmental power. The clause does not establish the various powers but simply states the powers of the branches are "separate and distinct." N.C. Const. art. I, § 6. The constitutional text develops the nature of those powers. *State Constitution* 46 ("Basic principles, such as popular sovereignty and separation of powers, are first set out in general terms, to be given specific application in later articles.").

Thus, the separation-of-powers clause "is to be considered as a general statement of a broad, albeit fundamental, constitutional principle," *State v. Furmage*, 250 N.C. 616, 627, 109 S.E.2d 563, 571 (1959), and must be considered with the related, more specific provisions of the constitution that outline the practical workings for governance,[3] *see* N.C. Const. art. II (providing the framework for legislative power); *id.* art. III (providing the framework for executive power); *id.* art.

---

[3] *Compare Piedmont Publ'g Co. v. City of Winston-Salem*, 334 N.C. 595, 598, 434 S.E.2d 176, 177-78 (1993) ("One canon of construction is that when one statute deals with a particular subject matter in detail, and another statute deals with the same subject matter in general and comprehensive terms, the more specific statute will be construed as controlling."), *with Preston*, 325 N.C. at 449, 385 S.E.2d at 478 ("Issues concerning the proper construction of the Constitution of North Carolina 'are in the main governed by the same general principles which control in ascertaining the meaning of all written instruments.' " (quoting *Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953))).

IV (providing the framework for judicial power). "Nowhere was it stated that the three powers or branches had to be equal. In fact, although the balance occasionally shifted, the preponderant power has always rested with the legislature." *State Constitution* 50.

Given that "a constitution cannot violate itself," *Leandro v. State*, 346 N.C. 336, 352, 488 S.E.2d 249, 258 (1997), a branch's exercise of its express authority by definition comports with separation of powers. A violation of separation of powers only occurs when one branch of government exercises, or prevents the exercise of, a power reserved for another branch of government. *McCrory*, 368 N.C. at 660, 781 S.E.2d at 265.[4] Understanding the prescribed powers of each branch, as divided between the branches historically and by the text itself, is the basis for stability, accountability, and cooperation within state government. *See State v. Emery*, 224

---

[4] A coordinate branch may not encroach upon or exercise a power that the text of the state constitution expressly allocates to another branch. *See, e.g.*, *Bacon v. Lee*, 353 N.C. 696, 704, 549 S.E.2d 840, 846-47 (2001) (recognizing that any substantive review of the Governor's express constitutional authority to grant clemency would have resulted in an attempt by the judiciary to exercise a power reserved for the executive branch, thus violating separation of powers); *Elam*, 302 N.C. at 160, 273 S.E.2d at 664 (preventing the General Assembly from making rules for the state's appellate courts because those powers were reserved for the Supreme Court by express provision in Article IV, Section 13(2) of the state constitution); *Person v. Bd. of State Tax Comm'rs*, 184 N.C. 499, 502-04, 115 S.E. 336, 339-40 (1922) (concluding that, for the judicial branch to compel the collection of taxes on stockholder income when no statute requires such a tax would interfere with the General Assembly's constitutional power of taxation); *State v. Holden*, 64 N.C. 829, 830 (1870) (The power to "declare a County . . . in a state of insurrection, and call out the militia" "is a discretionary power, vested in the Governor by the Constitution . . . and cannot be controlled by the Judiciary, but the Governor alone is responsible to the people for its proper exercise.").

N.C. 581, 584, 31 S.E.2d 858, 861 (1944) ("[Constitutions] should receive a consistent and uniform construction . . . even though circumstances may have so changed as to render a different construction desirable.").

IV.

When confronted with an alleged separation-of-powers violation, a court must first determine if the conflict is nonjusticiable under the political question doctrine. Under this doctrine, courts will refuse to resolve a dispute of "purely political character" or when "[judicial] determination would involve an encroachment upon the executive or legislative powers." *Political Questions*, *Black's Law Dictionary* (6th ed. 1990). Federal guidance provides that, "as essentially a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 710, 7 L. Ed. 2d 663, 686 (1962), a court should not review questions better suited for the political branches. The same separation-of-powers principles limit this Court's review.

> The political question doctrine controls, essentially, when a question becomes "not justiciable . . . because of the separation of powers provided by the Constitution." *Powell v. McCormack*, 395 U.S. 486, 517, 23 L. Ed. 2d 491, 514 (1969). "The . . . doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. The Judiciary is particularly ill-suited to make such decisions . . . ." *Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 230, 92 L. Ed. 2d 166, 178 (1986). "It is well established that the . . . courts will not adjudicate political questions." *Powell*, 395 U.S. at 518, 23 L. Ed. 2d at 515. A question may be held nonjusticiable under this doctrine if it involves "a textually

> demonstrable constitutional commitment of the issue to a
> coordinate political department." *Baker v. Carr*, 369 U.S.
> 186, 217, 7 L. Ed. 2d 663, 686 (1962).

*Bacon v. Lee*, 353 N.C. 696, 717, 549 S.E.2d 840, 854 (2001) (ellipses in original).

As explained by the Supreme Court of the United States, under the political question doctrine, a court should refuse to become embroiled in a separation-of-powers dispute if any one of the following is true: (1) there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department;" (2) the matter involves "a lack of judicially discoverable and manageable standards for resolving it;" (3) the matter is impossible to "decid[e] without an initial policy determination of a kind clearly for nonjudicial discretion;" or (4) a court cannot possibly undertake an "independent resolution without expressing lack of the respect due coordinate branches of government." *Baker,* 369 U.S. at 217, 82 S. Ct. at 710, 7 L. Ed. 2d at 686. The presence of any one of these factors cautions against judicial entanglement. Judicial review of a political question itself violates separation of powers because the Court asserts a power it does not have to prevent the exercise of a specific power held by a political branch.

## V.

Against the backdrop of the General Assembly's plenary legislative power,[5] Article III provides the General Assembly specific authority to create and structure

---

[5] The General Assembly possesses the plenary power to make law. Were the constitution silent as to which branch can by law reorganize administrative agencies, the

administrative entities. The constitution likewise gives the Governor specific guidelines by which he may influence the allocation of administrative functions, powers, and duties. Nonetheless, the text reserves the final authority for the legislative branch:

> (10) Administrative reorganization. The General Assembly shall prescribe the functions, powers, and duties of the administrative departments and agencies of the State and may alter them from time to time, but the Governor may make such changes in the allocation of offices and agencies and in the allocation of those functions, powers, and duties as he considers necessary for efficient administration. If those changes affect existing law, they shall be set forth in executive orders, which shall be submitted to the General Assembly not later than the sixtieth calendar day of its session, and shall become effective and shall have the force of law upon adjournment sine die of the session, unless specifically disapproved by resolution of either house of the General Assembly or specifically modified by joint resolution of both houses of the General Assembly.

N.C. Const. art. III, § 5(10). By the plain language, the General Assembly has the express authority to "prescribe the functions, powers, and duties of the administrative departments and agencies of the State and may alter them from time to time." *Id.*; *see also McCrory*, 368 N.C. at 664, 781 S.E.2d at 268 (noting "the

---

legislative branch retains the authority to do so. *See McIntyre*, 254 N.C. at 515, 119 S.E.2d at 891 ("[A] State Constitution is in no matter a grant of power. All power which is not limited by the Constitution inheres in the people, and an act of a State legislature is legal when the Constitution contains no prohibition against it." (quoting *Lassiter v. Northampton Cty. Bd. of Elections*, 248 N.C. 102, 112, 102 S.E.2d 853, 861 (1958), *aff'd*, 360 U.S. 45, 79 S. Ct. 985, 3 L. Ed. 2d 1072 (1959))).

General Assembly's significant express constitutional authority to assign executive duties to the constitutional executive officers and organize executive departments").[6]

Elsewhere in the same Article, the text again acknowledges the General Assembly's authority over administrative agencies:

> [A]ll administrative departments, agencies, and offices of the State and their respective functions, powers, and duties shall be allocated by law among and within not more than 25 principal administrative departments so as to group them as far as practicable according to major purposes. Regulatory, quasi-judicial, and temporary agencies may, but need not, be allocated within a principal department.

N.C. Const. art. III, § 11. It is the General Assembly that statutorily assigns the "respective functions, powers, and duties" of "all administrative departments, agencies, and offices." *Id.* Moreover, the text specifically acknowledges the validity of "[r]egulatory, quasi-judicial, and temporary agencies" independent of any principal department of the executive branch. *Id.*

By executive order, the Governor may also "make such changes . . . as he considers necessary for efficient administration." *Id.* art. III, § 5(10). When the Governor makes changes, he submits them to the General Assembly, and they become effective "unless specifically disapproved by resolution of either house . . . or

---

[6] The majority correctly notes that in *McCrory* the General Assembly did not argue that the Governor's challenge constituted a nonjusticiable political question. *But see McCrory*, 368 N.C. at 661, 781 S.E.2d at 266 (analogizing clemency review as "an explicit constitutional power" of the Governor, thus presenting "a nonjusticiable, political question," with the General Assembly's designated, "constitutional power to assign itself the authority to fill statutory positions" (citing *Bacon*, 353 N.C. at 716-17, 549 S.E.2d at 854)).

specifically modified by joint resolution." *Id.* Much like the gubernatorial veto, the General Assembly retains the prerogative to statutorily override these changes, to reorganize the structure and functions of the executive branch, and to alter the branch's supervisory structure. *Id.* art. III, §§ 5(10), 11.

The framers of our current constitution understood the text of Article III, Sections 5(10) and 11 as simply incorporating the historic legislative authority to create and reorganize administrative divisions by statute:

> The General Assembly will not be deprived of any of its present authority over the structure and organization of state government. It retains the power to make changes on its own initiative, it can disapprove any change initiated by the Governor, and it can alter any reorganization plan which it has allowed to take effect and then finds to be working unsatisfactorily.

N.C. State Constitution Study Comm'n, *Report of the North Carolina State Constitution Study Commission* 131-32 (1968) [hereinafter *Report*].[7] Though the General Assembly may arrange an administrative structure or assign a particular power, function, or duty to an administrative office at present, the constitution provides that the legislature may arrange differently or assign elsewhere in the future. *Id.* Inherently, these decisions involve political and policy decisions.

---

[7] Before the state constitution incorporated the specific text of Article III, section 5(10), the North Carolina State Constitution Study Commission reviewed our constitution, drafted and proposed amendments to our current constitution, and transmitted a special report to the Governor and General Assembly. *See Report* at i-ii.

As demonstrated here, the text of Article III, Sections 5(10) and 11 specifically assigns to the General Assembly authority over the administrative divisions it legislatively creates,[8] including the power to alter those same administrative divisions, to structure them as bipartisan, and to make them independent by housing them outside of the executive branch. N.C. Const. art. III, §§ 5(10), 11. The text of Article III, Section 5(10) likewise specifically affords the Governor a role for making changes by executive order, but subjects those changes to legislative approval. *Id.* art. III, § 5(10).

Significantly, there is nothing in the constitutional text of Article III, Sections 5(10) or 11 which limits the power of the General Assembly to create an independent, bipartisan board. Likewise, there is no constitutional text that grants the Governor the power to assert personal policy preferences, much less the power to override a

---

[8] Relevant here, the constitution specifically recognizes that the General Assembly's policymaking authority includes passing laws related to and regulating elections. *See* N.C. Const. art. VI, § 2(2) ("The General Assembly may reduce the time of residence for persons voting in presidential elections."); *id.* art. VI, § 2(3) ("No person adjudged guilty of a felony against this State or the United States . . . shall be permitted to vote unless that person shall be first restored to the rights of citizenship in the manner prescribed by law."); *id.* art. VI, § 3 ("Every person offering to vote shall be at the time legally registered as a voter as herein prescribed and in the manner provided by law. The General Assembly shall enact general laws governing the registration of voters."); *id.* art. VI, § 5 ("A contested election for any office established by Article III of this Constitution shall be determined by joint ballot of both houses of the General Assembly in the manner prescribed by law."); *id.* art. VI, § 8 (recognizing the General Assembly's right to prescribe laws restoring rights of citizenship); *id.* art. VI, § 9 ("No person shall hold concurrently any two or more appointive offices or places of trust or profit, or any combination of elective and appointive offices or places of trust or profit, except as the General Assembly shall provide by general law."). The constitution recognizes no similar role for the Governor.

policy decision of the General Assembly. Neither Section 5(4) of Article III nor any other constitutional provision gives the Governor an authority that in any way conflicts with the General Assembly's assigned power in Sections 5(10) and 11. Section 5(4) does not limit the power of the General Assembly in any manner; it simply requires the Governor to execute the laws as enacted by the General Assembly. Section 5(4) says nothing about the Governor's role in reorganization and clearly is not an "explicit textual limitation" on the General Assembly's power. The constitutional provisions of Article III do not conflict. The General Assembly makes the laws, and the Governor implements them. As conceded by the majority, when "the Governor is seeking to have the judicial branch interfere with an issue committed to the sole discretion of the General Assembly," the matter is nonjusticiable. The trial court correctly observed:

> g.    The text of the Constitution makes clear that the power to alter the functions and duties of state agencies is reserved to the Legislature through its law-making ability and to the Governor through executive order subject to review by the Legislature.
>
> h.    This Court cannot interject itself into the balance struck in the text of a Constitution specifically dealing with the organization and structure of a state agency. The [challenge here] is a political question and therefore a nonjusticiable issue, and this Court lacks authority to review it.

VI.

Moreover, not only does this case present a political question because the constitution textually commits the type of government reorganization here to the General Assembly, *see Baker*, 369 U.S. at 217, 82 S. Ct. at 710, 7 L. Ed. 2d at 686, this lawsuit likewise requires an "initial policy determination of a kind clearly for nonjudicial discretion," *id.* at 217, 82 S. Ct. at 710, 7 L. Ed. 2d at 686.

Here the General Assembly enacted Session Law 2017-6, creating the bipartisan board, "an independent regulatory and quasi-judicial agency [that] shall not be placed within any principal administrative department." Act of Apr. 11, 2017, ch. 6, sec. 4(c), 2017-2 N.C. Adv. Legis. Serv. 21, 25 (LexisNexis) (codified at N.C.G.S. § 163A-5(a) (2017)). In its enactment, the General Assembly found, among other policy reasons,

> that bipartisan cooperation with election administration and ethics enforcement lends confidence to citizens in the integrity of their government; and . . . it [is] beneficial and conducive to consistency to establish one quasi-judicial and regulatory body with oversight authority for ethics, elections, and lobbying; and . . . it [is] imperative to ensure protections of free speech rights and increase public confidence in the decisions to restrict free speech; and . . . voices from all major political parties should be heard in decisions relating to First Amendment rights of free speech . . . .

Ch. 6, 2017-2 N.C. Adv. Legis. Serv. at 21. As evident from the stated purpose, the decision to place elections, lobbying, ethics, and campaign finance within a bipartisan, independent agency, at its heart, is a policy one, seeking to insulate these

areas from political influence and creating the structure for achieving this end. Such a decision is precisely the type of "initial policy determination" assigned to the legislative branch. *See Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs*, 363 N.C. 500, 512, 681 S.E.2d 278, 286 (2009) (Newby, J., concurring) (concluding that political considerations "should be left to a body like the General Assembly, which is in the best position to consider the full range of evidence and balance the competing objectives").

While the Governor attacks the independent and bipartisan nature of the consolidated board, a judicial resolution would require an initial policy determination this Court cannot make[9] and judicially discoverable and manageable standards that do not exist. By inserting itself into this controversy, the Court expresses a "lack of the respect due" the General Assembly's express constitutional lawmaking authority. This case presents a nonjusticiable political question because it satisfies not just one, which would be sufficient, but all four of the cited *Baker* criteria.

## VII.

The majority's novel analysis creates two significant problems in our jurisprudence, forecasting perilous consequences for years to come. The majority's approach eliminates the political question doctrine and inserts the judiciary into

---

[9] As the majority concedes, "the General Assembly has the authority to provide the [board] with a reasonable degree of independence from short-term political interference and to foster the making of independent, non-partisan decisions. All of these determinations are policy-related decisions committed to the General Assembly rather than to this Court."

every separation-of-powers dispute between the political branches. Most concerning, the Court's decision judicially amends our constitution to grant the Governor a constitutional power to enact personal policy preferences, even elevating those preferences over the duly enacted laws when they conflict. While the majority correctly states the traditional rule for nonjusticiability as outlined in *Bacon* and *Baker*, it then crafts an exception to nonjusticiability that completely swallows the rule: Matters are justiciable any time a party seeks to have the Court "ascertain the meaning of an applicable legal principle, such as [a constitutional provision]."

Under the majority's new test, every separation-of-powers dispute is justiciable. Without exception, a party to a constitutional lawsuit asks the Court to "ascertain the meaning of [the] applicable legal principle." Swept up in this broad reach is *Bacon*, in which this Court held a challenge to a governor's textual clemency power was a nonjusticiable political question. *Bacon*, 353 N.C. at 716-17, 721-22, 549 S.E.2d at 854, 857. The plaintiff there sought the "meaning" of the applicable legal principle, Article III, Section 5(6). *See id.* at 701-04, 711, 549 S.E.2d at 844-47, 851 (asking whether a governor, who as Attorney General defended against the plaintiff's appeal, could consider the plaintiff's clemency request under Article III, Section 5(6)). Under the majority's new test, however, this Court wrongly decided *Bacon*. Such an approach to separation-of-powers claims unavoidably sounds the death knell of nonjusticiability. Any claim by a governor under Article I, Section 6 and Article III, Section 5(4) against the legislative branch will be justiciable.

The majority vainly searches to support this inventive approach with a Court of Appeals decision. In *News & Observer Publishing Co. v. Easley*, the *News & Observer* filed a public records request for clemency records, arguing the Public Records Law was a "regulation[ ] prescribed by law relative to the manner of applying for pardons" as envisioned by Article III, Section 5(6). *News & Observer Publ'g Co. v. Easley*, 82 N.C. App. 14, 22-23, 641 S.E.2d 698, 704-05 (2007) (quoting N.C. Const. art. III, § 5(6)). In essence, the dispute was not a question regarding a constitutional power textually committed to one branch. It involved the straightforward application of a constitutional provision to a statute. The Court of Appeals simply decided the Public Records Law was not a regulation "relative to the manner of applying for pardons." *Id.* at 23, 641 S.E.2d at 704.

Seeming to question its own analysis, the majority maintains that

> even if one does not accept this understanding of the scope of the General Assembly's authority under Article III, Section 5(10), we continue to have the authority to decide this case because the General Assembly's authority pursuant to Article III, Section 5(10) is necessarily constrained by the limits placed upon that authority by other constitutional provisions.

While the majority cites examples of express limitations that applied in other cases, it does not identify any such constitutional provision that expressly "limits" the General Assembly's authority under Article III, Sections 5(10) and 11.

The majority concedes that the constitution in Article III, Sections 5(10) and 11 textually assign to the General Assembly the authority to create the bipartisan

board. It further admits that if the constitution assigns a specific power to a branch, a challenge to that power is nonjusticiable. Missing an actual "explicit textual limitation," the majority manufactures one to create a conflict in the text by judicially rewriting Article III, Section 5(4) to say, "The Governor shall take care that the Governor's personal policy preferences be faithfully executed." It thereby judicially creates a constitutional authority of the Governor to enforce personal policy preferences superior to the General Assembly's historic constitutional authority to make the laws. The majority then holds that, beyond a reasonable doubt, the General Assembly violated separation of powers in creating this bipartisan board because the board's structure prevents the Governor from exercising this newly-minted constitutional authority. Under this holding, the Governor no longer must seek to influence policy by participating in the constitutionally specified procedures of executive orders and the veto, both of which the General Assembly can override. The Governor prevails simply by complaining to the judicial branch that any legislation interferes with the implementation of personal policy preferences.

## VIII.

Prominent jurists have warned that courts undermine their legitimacy when they take sides in policy questions assigned to the political branches:

> The Court's authority—possessed of neither the purse nor the sword—ultimately rests on sustained public confidence in its moral sanction. Such feeling must be nourished by the Court's complete detachment, in fact and in appearance, from political

entanglements and by abstention from injecting itself into the clash of political forces in political settlements.

*Baker*, 369 U.S. at 267, 82 S. Ct. at 737-38, 7 L. Ed. 2d at 714-15 (Frankfurter, J., dissenting). With today's sweeping opinion, the majority effectively eliminates the political question doctrine, embroiling the Court in separation-of-powers disputes for years to come. In reaching this decision, the majority creates a new and superior constitutional power in the Governor to enforce personal policy preferences, elevating those policy preferences over the constitutionally enacted laws. The General Assembly has the express, as well as the plenary, authority to create a bipartisan, independent board as it did here. Because the General Assembly acted within its express constitutional power, plaintiff's challenge presents a nonjusticiable political question. The only separation of powers violation in this case is this Court's encroachment on the express constitutional power of the General Assembly. Accordingly, I dissent.